UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NOELLE FARRY, as Administratrix of the   :
Estate of Jason Swift, and as Parent and   :
Next Friend of Matthew Swift, a minor   :
                                     :
        v.                      :          C.A. No. 08-325S
                                     :
CITY OF PAWTUCKET, by and through   :
its Finance Director Ronald L. Wunschel;   :
WALLACE H. MARTIN, individually and in his   :
representative capacity; ANTHONY M.   :
LUCCHETTI, individually and in his   :
representative capacity; DAVID F. DOLAN,   :
individually and in his representative capacity;   :
EDWARD WARDYGA, individually and in   :
his representative capacity; MICHAEL NEWMAN, :
individually and in his representative capacity   :
and JOHN and JANE DOES, 1 though 10,   :
individually and in their representative capacities   :

DEFENDANTS', CITY OF PAWTUCKET, WALLACE H. MARTIN, ANTHONY M.
LUCCHETTI, DAVID F. DOLAN, MICHAEL NEWMAN AND EDWARD WARDYGA,
PRETRIAL MEMORANDUM OF LAW

**I.**    **PARTIES:**

Plaintiff -    Noelle Farry, as Administratrix of the Estate of Jason Swift, and as Parent and

               Next Friend of Matthew Swift, a minor.

Defendants -   City of Pawtucket, Wallace Martin, Anthony M. Lucchetti, David F. Dolan,

               Michael Newman and Edward Wardyga.

**II.**    **CLAIMS**

       Count I - 42 U.S.C. §1983 claim, against all defendants for violation of plaintiff's

constitutional rights;

       Count II -  Assault and battery against Defendant Officers Martin, Lucchetti, Dolan and

Kelly.  Damages sought pursuant to R.I.'s Wrongful Death statute, *R.I.G.L. § 10-7-1 et seq.*;

Count III - R.I.'s Wrongful Death statute, *R.I.G.L. § 10-7-1 et seq.* against all defendants based on alleged negligence and wrongful conduct by defendants.

Count IV - *42 U.S.C. § 1983* claim against City for alleged unconstitutional policy and practice.

Count V - *42 U.S.C. § 1983* claim against John/Jane Doe defendants for failure to train and supervise individual officers.

Count VI - negligent training and supervision claim against John/Jane Doe defendants;

Count VII - respondeat superior claim against City for alleged actions of Defendant Martin, Lucchetti, Dolan, Wardyga, Newman and Kelly.

Count VIII - state law  loss of consortium, on behalf of minor, Matthew Swift, against all defendants

Count IX - punitive damages against Defendant Martin, Lucchetti and Dolan.

## III.    BACKGROUND FACTS

On February 12, 2008, Betty Swift, the mother of decedent Jason Swift, called the Pawtucket Police Department through 911. She expressed concern about her son, who had been "talking crazy." *Plaintiff's Complaint, at ¶ 13.*  Dispatcher Edward Wardyga dispatched Officer Wallace Martin and Officer Anthony Lucchetti to 71 Lupine Street, Pawtucket, RI, at approximately 7:35 A.M. *Dispatch Log, at 13.*

Officers Martin and Lucchetti arrived at the address approximately three minutes later, at approximately 7:38 A.M.  *Id,*  After speaking with plaintiff decedent's mother, the officers approached the apartment building to find Mr. Swift, who was approximately six (6) feet, five (5) inches tall, and two hundred and eighty (280) pounds, exiting the building.  *Deposition of Anthony M. Lucchetti (May 18, 2009)* at 52 & 55.  Mr. Swift was holding a large, sheathed,

Samurai sword.  *Id.* at 55.  Officers Martin and Lucchetti immediately drew their weapons and ordered Mr. Swift to drop the sword, and he complied.  *Id. at 58, 59, 60 & 63*.  The officer then ordered Mr. Swift to get to the ground  however he did not comply.  *Id. at 67 & 82*.  He did however lift his shirt and turn around.  As Officer Martin then attempted to place his hands on Mr. Swift, Mr. Swift violently swung his right hand, knocking the sunglasses off of Officer Martin's face. *Id. at 87 & 90*.  The police officers then attempted, using batons and pepper spray, to restrain Mr. Swift.  *Id. at 93-94*.  Mr. Swift, however shook off the pepper spray and the batons. *Id.*  They had absolutely no effect on him.  *Id.*

Mr. Swift then walked away from the officers and went back into the apartment building. *Id. at 95*.  Defendant Officer Dolan then joined Officer Martin and Officer Lucchetti at the scene and all three (3) officers pursued Mr. Swift into the apartment building.  *Id. at 102 & 103*.  They heard yelling and screaming coming from a third floor apartment.  *Id. at 105 & 106*.  Officer Martin commanded Mr. Swift to come out, but he did not respond.  *Id. at 106-107 & 109*. Officer Martin kicked in the door and the officers entered the apartment.  *Id. at 109-110*.  The officers immediately encountered Mr. Swift, who was near the door naked, with his hands up mumbling that he was "cool" and "loved them."  *Id. at 125 & 133*.  The officers again ordered Mr. Swift to get on the ground.  Mr. Swift initially began to comply, however, as he was moving into the prone position, one of the officers started to take hold of his wrist to apply a handcuff and Mr. Swift became violent, jumping up, swinging and attacking Officer Lucchetti by trying to grab him by the throat. *Id. at 137*.  All three (3) officers used their batons in an attempt to stop plaintiff decedent from attacking Officer Lucchetti.  *Id.*  Plaintiff decedent let go of Officer Lucchetti and, turning his attention to Officer Martin, grabbed Officer Martin in a bear-hug style grip.  *Id.* 147-148.  Officer Martin was only able to get out of plaintiff decedent's grip by

slipping out of his jacket.  Officer Dolan then tackled plaintiff decedent and the group fell onto and broke the coffee table. *Id. 148*.   The officers all got their feet and ordered plaintiff to stay on the ground.  Plaintiff decedent, however, refused to stay on the ground and began to get up heading towards Officer Martin.  Officer Lucchetti used his baton to again hit plaintiff decedent and try to stop him but he lunged for Officer Martin.  Officer Martin continued to scream at Mr. Swift to stop, but Mr. Swift kept coming at Officer Martin who then, in fear of his life, fired his gun hitting Mr. Swift in the chest. *Id. at 158*.   Mr. Swift stopped briefly after getting hit by the bullet, but, then he lunged again at Officer Martin.  *Deposition of David F. Dolan (May 20, 2009), at 173*. Officer Martin fired a second shot that stopped Mr. Swift. *Id.*  The officers then immediately called for a rescue at approximately 7:44 A.M.  *Dispatch Log, at 15*.  Jason Swift died at the scene.

The entire incident from the time Officers Martin and Lucchetti arrived on the scene until plaintiff decedent was shot took approximately six (6) minutes. *Dispatch Log, at 13 & 15*

## IV.   POTENTIAL WITNESSES

Officer Wallace Martin - officer at scene who will testify as to the events starting with initial encounter with decedent's mother and leading up to the shooting.

Officer Anthony Lucchetti.  - officer at scene who will testify as to the events starting with initial encounter with decedent's mother and leading up to the shooting.

Officer David Dolan  -  officer at scene who will testify as to the events starting with officers' entry into the apartment and leading up to the shooting.

Officer David Kelly -  officer at scene who will testify as to shooting.

Lieutenant Michael Newman - Officer in Charge on day of incident will testify as to the receipt of the call and actions in response.

Edward Wardyga. Dispatcher - dispatcher on duty who will testify as to receipt of mother's call for assistance and dispatch of officers to scene both before and after shooting.

<u>Chief George Kelley</u> - Chief of Police, City of Pawtucket who will testify as to Department's training program.

<u>Major Bruce Moreau</u> - Captain, formerly in charge of Planning & Training who will testify as to training program of Department.

<u>Captain Glenn Haberle</u> - Captain, Internal Affairs Division who will testify as to Department's investigation into the shooting.

<u>Captain William Karalis</u> - Captain, currently in charge of Planning & Training who will testify as to Department's training program.

<u>Sergeant Manny Maciel</u> - Sergeant on duty on day of incident will testify as to the receipt of the call and actions in response as well as scene after shooting.

<u>Detective Sergeant Richard Stonely</u> - officer who participated in the internal affairs investigation.

<u>Noelle Farry</u> - Plaintiff mother of Jason Swift's child.

<u>Deanna Farry</u> - Plaintiff's mother who is familiar with Jason Swift and the decedent's relationships with plaintiffs.

<u>Betty Swift</u> - Mother of Jason Swift who will testify as to son's psychological problems as well as call to police and incidents outside apartment house.

<u>Thomas Riebe</u> - Step father of Jason Swift who will testify as to Swift's psychological problems.

<u>Amanda Swift</u> - Niece of Betty Swift who lived with Jason Swift and will testify as to her experiences with Jason Swift and as to the events of the morning of the incident.

<u>Lynn Miller</u> - Neighbor of Jason Swift who will testify as to incident outside apartment on day of shooting.

**<u>Experts</u>:**

<u>Dr. Deborah Mash.</u> - Will testify on the subject of excited delirium.

<u>Barry W. Wall, MD</u> - Will testify on the subject of the mental health of Jason Swift.

<u>Richard Wall</u> - Will testify on the subject of police practices.

<u>Matthew Noedell</u> - Will testify on the subject of firearm and bullet path consideration.

## V.      SUPPORTING CASE LAW

### A.      COUNT I - 42 U.S.C. §1983 CLAIM AGAINST ALL DEFENDANTS FOR VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

In Count I, plaintiff seeks to maintain a § 1983 claim against all the defendants fro the alleged violation of plaintiff's constitutional rights.  Plaintiff's theory of recovery is based on the alleged use of excessive force both during the officers' initial encounter with plaintiff outside his mother's home as well as the shooting of plaintiff inside the apartment.  Plaintiff also premises a § 1983 claim against Lt. Newman and Dispatcher Wardyga for these individual's failure to send a supervisor to the scene.

#### 1.      OFFICERS MARTIN, LUCCHETTI AND DOLAN – INITIAL ENCOUNTER

As noted, plaintiff first maintains that Officers Martin, Lucchetti and Dolan violated plaintiff's constitutional rights during the initial encounter with plaintiff outside his parent's house.  In opposition to defendants' Motion for Partial Summary Judgment, plaintiff argued that there was no basis to detain plaintiff in the first instance and thus their attempt to apprehend him amounted to a violation of his constitutional right to be free from unlawful seizure.

Analyzing this claim begins with the recognition of the information the officers received when they arrived at the scene.  Ms. Swift, plaintiff's mother, who called 911 in an attempt to get help having her son brought to the hospital, met the officers and warned them that her son was a "very big man", "very strong" and that he was not going to "go easily" with them. *Betty Swift, R.I. State Police Witness Statement, (February 12, 2008), at 5, 6 & 7 (Exhibit G).*  Ms Swift also indicated her conviction that her son was having a "nervous breakdown" and needed "psychiatric help,  . . get to a hospital."  *Deposition of Betty Swift, (July 16, 2009) at 70-71 (Exhibit H).*

Plaintiff bases the claim of a constitutional deprivation on the argument that the officers lacked probable cause to detain decedent.  However, in light of the information provided by Ms.

Swift, defendants submit that probable cause to take plaintiff into custody under R.I.'s Mental

Health Laws did exist.[1] The R.I. General Assembly has expressly granted police officers the

authority to take individual with mental health issues into custody.   Sec. 40.1-5-7(1)(a) states, in

pertinent part, that:

> "Any physician, who after examining a person, has reason to believe that the person is in
> need of immediate care and treatment, and is one whose continued unsupervised presence
> in the community would create an imminent likelihood of serious harm by reason of
> mental disability, may apply at a facility for the emergency certification of the person
> thereto….In the event that no physician is available, *a qualified mental health
> professional or police officer who believes the person to be in need of immediate care
> and treatment, and on whose continued unsupervised presence in the community would
> create an imminent likelihood of serious harm by reason of mental disability, may make
> the application for emergency certification to a facility*."   (Emphasis added).

In fact, in <u>Ahern v. O'Donnell</u>, *109 F.3d 809, 817 (1st Cir. 1997),* the First Circuit applied

Massachusetts' similar commitment statute and found that "[p]olice officers have probable cause

to "seize" or detain an individual when circumstances warranting a reasonable belief that the

person to be seized does have a mental health condition threatening serious harm to himself or

---

[1] Defendants note that under the analogous "related crimes defense" it matters not that the individual officers ultimately articulated plaintiff's criminal act of assaulting the officer as the basis to take plaintiff into custody.   As summarized by the First Circuit:

> An officer's erroneous legal description of the basis for an arrest should not expose the officer to liability if
> another officer would have concluded that there was probable cause to arrest for a related offense on the
> basis of the same conduct. We agree that courts should not "make constitutional questions turn on the term
> chosen by police officers to describe their activity - officers who are accustomed to the vernacular of the
> police station and unschooled in the accepted constitutional vocabulary . . . ." <u>Ralph v. Pepersack</u>, *335 F.2d
> 128, 134 (4th Cir. 1964).* Instead, we should consider whether the conduct in question would allow a
> reasonable officer to conclude that probable cause existed to arrest for the related crime offered as
> justification. *See* <u>Biddle</u>, *992 F.2d at 676-77 (collecting cases).*

<u>Sheehy v. Town of Plymouth</u>, *191 F.3d 15, 20 (1st Cir. Mass. 1999).*   The First Circuit has concluded that this approach is consistent with <u>Harlow</u> by not basing § 1983 claims on the subjective intent of the officer.  That having been said, the Court does apply a two (2) step "relatedness" inquiry to "prevent the "ex post facto extrapolations of all crimes that might have been charged on a given set of facts at the moment of the arrest . . . ."  in order to justify a sham arrest.   <u>Sheehy</u>, *191 F.3d at 20 citing* <u>Richardson v. Bonds</u>, *860 F.2d 1427, 1431 (7th Cir. 1988);* <u>Biddle v. Martin</u>, *992 F.2d 673, 677 (7th Cir. 1993) (internal quotation marks omitted).*   "First, the crime with which the arrestee is charged and the crime offered to the court as a justification for the arrest must relate to the same conduct. Second, as a corollary of this first requirement, the two crimes must share similar elements or be directed generally at prohibiting the same type of conduct." *Id.*  While a detention pursuant to R.I.G.L. § 40.1-5-7(1)(a) is not an arrest for criminal activity, the underlying concept is the same.  Quite simply, under the statute the officers had probable cause to detain plaintiff.  *Ahern, 109 F.3d at 817.*

others." *Ahern*, 109 F.3d at 817.   The First Circuit further found it "irrelevant whether the defendants acted in an ideal manner" in executing this seizure. *Id. at 818.*

Police officers' authority under this statute is a natural extension of the community caretaking responsibilities.  As recognized by the *Ahern* court, "[t]he Supreme Court has recognized a particular exception to the warrant and probable-cause requirements in cases involving "special needs, beyond the normal need for law enforcement." *Id. at 817 quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (citation omitted).*  That is, police officers have a wide range of responsibilities aside from criminal enforcement.  "[They are] expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing, and provide an infinite variety of services to preserve and protect community safety." *U.S. v. Rodriguez-Morales, 929 F.2d 780, 784-785 (1ˢᵗ Cir. 1991).*  Courts have labeled this multifaceted role as "community caretaking." *Id*.  Indeed, police officers are not only permitted, but expected, to exercise their "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski, 413 U.S. 433, 441 (1973).* "In the course of exercising this non-investigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *U.S. v. King, 990 F.2d 1552, 1560 (10th Cir. 1993). See also Ferreira v. City of E. Providence, 568 F. Supp. 2d 197, 209 (D.R.I. 2008).*

Defendants submit that in the instant case, the information provided by Ms. Swift regarding her son's mental state standing alone is more than sufficient to give rise to probable cause to detain plaintiff. *Cf. Forest v. Pawtucket Police Dep't, 377 F.3d 52, 57 (1st Cir. R.I.*

2004)("*police officers can justifiably rely upon the credible complaint by a victim to support a finding of probable cause).*   Nevertheless, the officers had the added fact of plaintiff walking out of the residence carrying a sheathed sword.   Such information, as a matter of law, gives rise to probable cause to detain plaintiff.[2]

It is noteworthy that plaintiff has also specifically challenged the officers' decision to enter the residence in an attempt to take plaintiff into custody.   However, because "'[t]he ultimate touchstone of the Fourth Amendment, . . is 'reasonableness,' although "searches and seizures inside a home without a warrant are presumptively unreasonable," that presumption can be overcome. For example, "the exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Michigan v. Fisher*, 130 S. Ct. 546 (U.S. 2009) citing *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978). "This "emergency aid exception" does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only "an objectively reasonable basis for believing," that "a person within [the house] is in need of immediate aid." *Id.*   In this case, there was an objectively reasonable basis for believing that decedent was in need of immediate aid.   This objectively reasonable basis came in the form of Ms. Swift's representations that he was having a nervous breakdown, that he did not want to be hospitalized and his first appearance with a sword in his hands.   Thus, as a matter of law, there was an objectively reasonable basis to enter the apartment.[3]

---

[2] As noted *infra,* the officers nevertheless are entitled to qualified immunity.

[3] It is also noteworthy that Mrs. Swift herself gave the officers implicit authority to enter the apartment in order to take plaintiff into custody.  *U.S. v. Matlock*, 415 U.S. 164, 171 n.7 (1964), (explicitly recognized the right of a third party to consent to a warrantless search of property to which he has "joint access or control for most purposes."). Mrs. Swift called the officers to the premises for the specific purposes of taking her son to the hospital and had actual authority over the apartment such to grant the officers permission to enter.

Plaintiff also challenges to the officer's decision to handcuff plaintiff "without first making a reasonable (or any) effort to determine if he was a danger to himself or others." *Plaintiff's Memorandum, at 59.*  However, in making this statement, plaintiff ignores Mrs. Swift's representations that she warned the officers that her son was who was having a "nervous breakdown", was "very big", "very strong" and would not want to come with them to the hospital.  *Betty Swift R.I. State Police Witness Statement, (February 12, 2008), at 5, 6 & 7 (Exhibit G).*  She also feared that Officers Martin and Lucchetti were not big enough to handle plaintiff themselves.  <u>*Id.*</u>  Such information forms more than a reasonable basis, for the officer's safety and plaintiff's own safety, to attempt to place handcuffs on plaintiff.  Once there is a reasonable basis to restrain a subject, the officers were entitled to use all reasonable means of force to effectuate the same.  For all these reasons, defendants submit that plaintiff fails to meet the first prong of the qualified immunity standard because the facts alleged or shown by the plaintiff do not make out a violation of a constitutional right.

Plaintiff's Second Amended Complaint may also be read to seek liability based on perceived excessiveness in the level of force used in attempting to apprehend plaintiff outside the apartment.  There is generally a three-part test for excessive force claims under *§ 1983*.  The plaintiff must show:  (1) a significant injury; (2) resulting directly and only from the use of force that was clearly excessive to the need, and (3) the excessiveness of the force was objectively unreasonable.  <u>*Reese v. Anderson*</u>, *926 F.2d 494, 500 (5th Cir. 1991)*.  Plaintiff's claim that the officers used excessive force in the course of making an arrest is subject to the objective reasonableness standard governing the Fourth Amendment.  <u>*Graham v. Connor*</u>, *490 U.S. 386, 388 (1989)*.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight. When judging reasonableness, it must be factored in that "police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation." _Id._ at 396. In addition, this standard allows for evidence of what is known to the police officer at the time the force is applied. The knowledge of the police officer forms part of the "facts and circumstances attendant to the decision to use the particular degree of force." _See_ _Senra v. Cunningham, 9 F.3d 168 (1st Cir. 1993)._

To show that the police used excessive force in violation of the Fourth Amendment, plaintiff "must demonstrate that the police defendant[s'] actions were not objectively reasonable, viewed in light of the facts and circumstances confronting [them] without regard to [their] underlying intent or motivation." _Bastien v. Goddard, 279 F.3d 10, 14 (1st Cir. 2002)._ "The relevant circumstances include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" _Id. quoting_ _Graham v. Connor, 490 U.S. 386, 396 (1989)._ The objective reasonableness of the force used is also to be considered in light of the officers' obligation to "to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly-changing circumstances." _Gaudreault v. Salem, 923 F.2d 203, 205 (1st Cir. 1990)._

2.    OFFICERS MARTIN – SHOOTING

Plaintiff also alleges that Officer Martin violated plaintiff's constitutional right to be free from unreasonable force by shooting him. The basic case law surrounding the determination of what amount of force is reasonable likewise applies to the determination of whether Officer

Martin's decision to shoot infringed upon plaintiff's constitutional right by amounting to excessive force.

As held by the Supreme Court - "An officer's use of deadly force is subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner, 471 U.S. 1, 7 (1985).* The test is whether the officer's conduct was "objectively reasonable," *Graham v. Connor, 490 U.S. 386, 397 (1989)*, that is, whether the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others," *Garner, 471 U.S. at 3."   Berube v. Conley, 506 F.3d 79, 82-83 (1st Cir. Me. 2007).* The analysis also requires "careful attention to the facts and circumstances of each particular case, including . . . whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham, 490 U.S. at 397.* Because police officers may have to make split-second decisions in circumstances that are "tense, uncertain, and rapidly evolving," facts are to be "evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." *Gray-Hopkins v. Prince George's County, 309 F.3d 224, 231 (4th Cir. 2002).* An officer may use deadly force when he has good reason to believe that the suspect presents a threat of serious physical harm to himself or others. *Garner, 471 U.S. at 11.*

In making this assessment in the instant case, plaintiff has also challenged the decision to enter the apartment without the presence of a supervisor or mental health advocate. However, in determining if the officer's actions violated plaintiff's constitutional right, the determination is not based on which "strateg[y] represented the more prudent course or posed the least serious risk to the suspect, the officers or others in the vicinity. *Hegarty v. Somerset County, 53 F.3d 1367, 1377 (1st Cir. Me. 1995) citing Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) (noting*

that "*officers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [which is] . . . reasonable"; contrary rule "would inevitably induce tentativeness by officers"*).  Rather, the determination is based only on whether a competent police officer in these circumstances <u>reasonably</u> could have opted for this approach.  *Id.*

3.    OFFICERS LUCCHETTI AND DOLAN - SHOOTING

The liability of Officers Lucchett and Dolan as to the actual shooting differs in respect to the fact that they themselves did not shoot plaintiff.  It is well-settled that a police officer's liability under *§ 1983* for a fellow officer's unconstitutional acts[4] cannot be premised upon the mere fact that the officer was present at the time of the act.  "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring. <u>Anderson v. Branen</u>*, 17 F.3d 552, 556 (2nd Cir. 1994).*

Thus the standard for determining the liability of police officers who are present but do not commit the act is whether the police officer knew that a constitutional right was being violated and failed to prevent the use of excessive force in his presence by another police officer. <u>Hathaway v. Stone</u>*, 687 F.Supp. 708, 712 (citing cases) (D.Mass.1988) (holding that a reasonable officer who saw another officer drag an arrestee from a car, throw her to the ground, and begin to kick her, would realize that he was under a duty to stop the assault); <u>accord</u>*

---

[4] Although defendants specifically deny that Officer Martin violated plaintiff's constitutional rights, should the jury determine that his actions infringed upon plaintiff's constitutional rights, the liability of the other officers cannot be based purely on this finding.

*O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988) (citing cases); *Gross v. Bohn*, 782 F.Supp. 173, 179 (D.Mass.1991) (citing cases).  "However, an onlooker cannot be charged with section 1983 liability for another's sudden, momentary actions." *Noel v. Town of Plymouth, Mass.*, 895 F.Supp. 346, 352 (D.Mass. 1995) citing *Gaudreault v. Salem*, 923 F.2d 203, 207 n. 3 (1st Cir.1990) cert. denied, 500 U.S. 956 (1991).  As explained by the First Circuit, the question becomes whether the defendant officers had a " 'realistic opportunity' to prevent an attack." *Gaudreault*, 923 F.2d at 207 n. 3.  Where "the attack came quickly and was over in a matter of seconds" the officer cannot be liable for failing to prevent the same.  *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir.1988) ("The three blows were struck in such rapid succession that [the officer standing by] had no realistic opportunity to attempt to prevent them."); *Jesionowski v. Beck*, 937 F.Supp. 95, 104-05 (D.Mass.1996) (two quick blows to the head one right after the other did not give the officer standing by time to intervene); *Noel v. Town of Plymouth, Massachusetts*, 895 F.Supp. 346, 352-53 (D.Mass.1995) (a blow to the victim's face followed by a blow to the back were consistent with a "scuffle of quick duration" that the officers standing by had no realistic opportunity to intervene).

Thus, in order to succeed on the instant claim against the individual officers, plaintiff must demonstrate that Officers Lucchetti and Dolan not only knew that plaintiff's constitutional rights were being violated by Officer Martin but also that they were in a position to prevent Officer Martin from shooting plaintiff.  The evidence in this case is undisputed that the incident leading up to the shooting happened very quickly and was over in a matter of seconds.  Officer Lucchetti and Officer Dolan specifically testified that just before the shooting, they were standing off to the side and behind plaintiff-decedent who was facing Officer Martin.  *Deposition of Anthony M. Lucchetti (May 18, 2009)* at 151-152. *Deposition of David F. Dolan (May 20,*

*2009) at 169-170.*  Plaintiff decedent, who had been tackled by Officer Dolan, started to get up and head towards Officer Martin in a threatening manner.  Officer Lucchetti immediately attempted to stop plaintiff decedent by not only yelling at him but by hitting his shoulder and arm that plaintiff decedent was using to push himself off the ground.  *Lucchetti Deposition, at 155.*  Plaintiff decedent, however, was unfazed by Officer Lucchetti's actions and lunged at Officer Martin.  *Id. at 158.  Dolan Deposition, at 172.*[5] Officer Martin fired his weapon hitting plaintiff decedent in the chest.

    Even assuming that Officer Martin's decision to shoot amounted to a deprivation of plaintiff decedent's constitutional rights, there is absolutely no evidence to support a finding that Officers Luchetti or Dolan had a "'realistic opportunity' to prevent" the shooting.  *Gaudreault, 923 F.2d at 207 n. 3.  See also Gilbert v. Baldwin, 2007 U.S. Dist. LEXIS 83106 (E.D. Cal. Oct. 29, 2007)* ("no evidence that Corporal Ray had a realistic opportunity to intervene to prevent Deputy Baldwin's firing of the second and third shots, as the time interval was short and the sequence of events continuous"); *Hogan v. City of Easton, 2006 U.S. Dist. LEXIS 65628 (E.D. Pa. Sept. 12, 2006)* ("There is no dispute that the use of force in this case happened in a matter of seconds, and we conclude that no reasonable juror could find that the non-shooting officers had an opportunity to intervene").  Up until the shooting, the officers had been taking every non-lethal means available to control plaintiff-decedent and take him into custody.  There is no dispute that plaintiff-decedent moved very quickly, lunging towards Officer Martin.  *Lucchetti Deposition, at 158; Dolan Deposition, at 172.*  Officer Martin's use of force thus happened in a matter of seconds.  Assuming Officer Martin violated plaintiff's constitutional rights by shooting him, there was no realistic opportunity for Officers Lucchetti or Dolan to stop this act.

---

[5] All officer testified that Mr. Swift was unfazed by any of their attempts to control him including ignoring the strikes to his head with their batons and the pepperspray.

Consequently, lacking an opportunity to intervene, neither Officer Lucchetti nor Officer Dolan can be held liable for plaintiff decedent's claimed constitutional deprivation or his alleged wrongful death.

### 4.   FAILURE TO FOLLOW RULES AND REGULATIONS DO NOT AMOUNT TO A VIOLATION OF CONSTITUTIONAL RIGHT

In light of plaintiff's Objection to Defendants' Motion for Partial Summary Judgment, defendants expect plaintiff to attempt to use the perceived violation of the Department's Rules and Regulations in support of their constitutional claims against the defendants. However, under well-settled case law, the perceived violation of the Department's policies does not give rise to a constitutional violation.

Quite simply, *§ 1983* only imposes liability for violations of rights protected by the Constitution or federal statutes, not for violations of state law. *Snowden v. Hughes, 321 U.S. 1, 11 (U.S. 1944). See also Ting v. United States, 927 F.2d 1504, 1511 (9th Cir. 1991); Boston v. Massachusetts Port Authority, 444 F.2d 167, 169 (1st Cir. Mass. 1971); Hernandez v. Gates, 100 F. Supp. 2d 1209, 1226 (C.D. Cal. 2000) ("Since the Court finds no basis for concluding that the conduct in issue violates federal law, the fact that it might violate state law is of no consequence under Section 1983"); Ochana v. Flores, 199 F. Supp. 2d 817, 830 (N.D. Ill. 2002) ("Allegations that the officers violated a Police Department General Order do not support a § 1983 claim, which must be grounded on violations of [plaintiff's] federal constitutional rights").* In the instant case, the alleged failure to abide by the Rules and Regulations, including the requirement that a supervisor be called or sent to the scene of an emotionally disturbed individual, is raised by plaintiff in support of her constitutional claims. However, while sending a supervisor may have been required by the Department's Rules and Regulations, plaintiff clearly does not have a constitutional right to have supervisor respond to a call for help for an

emotionally disturbed individual.  Thus, although it may be viewed as a violation of the Rules and Regulations, the defendants' failure to request or send a supervisor, as a matter of law, does not amount to a violation of plaintiff's constitutional rights.

 5. Lt. Newman

Plaintiff's § 1983 claim against Lt. Newman is based on the alleged failure of Lt. Newman to fulfill his supervisory duties.  *Plaintiff's Complaint, Counts I and III.*  Lt. Newman was the officer in charge on February 12, 2008, at the time the call came in for assistance.  Lt. Newman had no direct contact with plaintiff decedent.  Rather, plaintiff specifically alleges that, in violation of the Department Rules and Regulations, Lt. Newman failed to go himself or send a supervisor to the scene upon receiving the call for an emotionally disturbed individual. *Plaintiff's Second Amended Complaint, at ¶ 17.*  Plaintiff concludes that this omission resulted in the deprivation of plaintiff's constitutional rights and in the wrongful death of plaintiff, giving rise to liability under *§ 1983* and R.I.'s Wrongful Death statute, *R.I.G.L § 10-7-1 et seq.  See Complaint, ¶ 17, 28 and 34.*

Under Count I, plaintiff seeks to maintain a § 1983 claim against Lt. Newman for his alleged violation of plaintiff's constitutional rights.  Under § 1983, supervisory liability may not be based on the doctrine of respondeat superior, *see Monell, 436 U.S. at 694 n.58*, but only on the supervisor's own acts or omissions.  *Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. P.R. 2005).*  There are generally two (2) recognized means of establishing supervisory liability: either through the supervisor's direct participation in the unconstitutional conduct, or "where (1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was 'affirmatively link[ed]' to the behavior in the sense that it could be

characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence [. . .] amounting to deliberate indifference.'" *Id.*

A supervisor's action or inaction amounting to deliberate indifference will be found only if "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Germany v. Vance,* 868 F.2d 9, 18 (1st Cir. 1989). "The affirmative link requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." *Hegarty v. Somerset County,* 53 F.3d 1367, 1380 (1st Cir. 1995) *(internal citations and quotations omitted).* Indeed, it is very important that the Plaintiff "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." *Maldonado-Denis v. Castillo-Rodriguez,* 23 F.3d 576, 582 (1st Cir. 1994). In addition, the First Circuit requires Plaintiff to show that the supervisor's "conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." *Germany,* 868 F.2d at 17-18.

In this case, plaintiff relies upon Lt. Newman's alleged failure to send a supervisor to the scene immediately upon receiving the call for assistance to support their constitutional claim. Defendant submits that as a matter of law, this alleged malfeasance on the part of Lt. Newman does not give rise to a constitutional deprivation.[6] First, there is no dispute that Lt. Newman did not directly participate in the attempt to apprehend plaintiff decedent. Thus, in order to succeed on the constitutional claim against Lt. Newman, plaintiff must prove that Lt. Newman's actions amounted to "'supervisory encouragement, condonation or acquiescence' or 'gross negligence [. . .] amounting to deliberate indifference'" to the officers' actions. *Whitfield,* 431 F.3d at 14. The

---

[6] Of course, as more *infra,* the fact that the failure to dispatch a supervisor violates the Department Rules and Regulations is irrelevant to the determination of whether Lt. Newman violated plaintiff's constitutional rights. Section 1983 only imposes liability for violations of rights protected by the Constitution or federal statutes, not for violations of state law. *Snowden v. Hughes,* 321 U.S. 1, 11 (U.S. 1944). Plaintiff did not enjoy a constitutional right to have a supervisor present at the scene.

fact that Lt. Newman did not immediately dispatch a supervisor to the scene, even if proven, does not even come close to proving such "encouragement, condonation, gross negligence or deliberate indifference."  In fact, applying the _Germany_ standard, it simply would not "be manifest to any reasonable official that [failing to send a supervisor] was very likely to violate an individual's constitutional rights." _Germany, 868 F.2d at 18._  Even more directly, the undisputed facts do not support a conclusion that failing to immediately send a supervisor amounted to "a reckless or callous indifference to the constitutional rights of others." _Id. at 17-18._ To find otherwise would require the conclusion that without a supervisor's presence at the scene, it is "very likely" that a patrol officer is going to violate the constitutional rights of an emotionally disturbed individual.  There is simply nothing in either the history of the department or Lt. Newman's knowledge of the individual officer's themselves to support such a conclusion.  Thus, even if plaintiff's claim that Lt. Newman failed to send a supervisor to the scene is accepted as undisputed, such an omission does not give rise to a finding that Lt. Newman was "recklessly or callously indifferent" to the constitutional rights of plaintiff decedent.

In addition, there is simply no causal relationship between the perceived failure of Lt. Newman to immediately dispatch a supervisor to the scene and plaintiff's injuries.  In order to succeed on his § 1983 claim against Lt. Newman, plaintiff must "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." _Maldonado Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994)._  Although a _§ 1983_ claims have been described as "a species of tort liability," "not every injury in which a state official has played some part is actionable under that statute."  _Martinez v. Cal., 444 U.S. 277, 285 (U.S. 1980) quoting Imbler v. Pachtman, 424 U.S. 409, 417 (1976)._  Rather, in order to succeed on a § 1983 claim plaintiff must show a causal connection between the named defendant's actions and the

alleged constitutional deprivation.  *Francis v. Barlow, 2006 U.S. Dist. LEXIS 30394 (W.D. Ky. May 16, 2006) citing  King v. Massarweh, 782 F.2d 825, 829 (9th Cir. 1986).* "That is, a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 659 (6th Cir. Ky. 1994).* "Congress did not intend § 1983 liability to attach where causation is absent." *Deaton v. Montgomery County, 989 F.2d 885, 889 (6th Cir. 1993).* To establish causation, a plaintiff must adduce "an affirmative link . . . [a] moving force that animated the behavior . . . that resulted in the constitutional violations alleged." *Id.*  When the theory of causation is a matter of pure speculation and is nothing more than an hypothetical argument, the pleadings are insufficient to sustain a compensable § 1983 claim. *Horn, 22 F.3d at 659.*

Likewise, in order to succeed on the state law wrongful death claim against Lt. Newman, plaintiff will have to establish a causal link between Lt. Newman's alleged negligent act and plaintiff's death.  Under R.I. law, causation is established by competent proof that but for the negligence of defendant, harm to plaintiff would not have occurred.  *Mullaney v. Goldman, 398 A.2d 1133, 1136 (R.I. 1979).*  Stated another way, the negligent act must have played a substantial part in bringing about or actually causing the injury alleged by plaintiffs.  A party, even a negligent party, will not be held liable for an injury if the negligent act or omission did not play a substantial part or actually caused the injury complained of.  The injury must be either a direct result of the negligent act or a reasonably probable or natural consequence of the act. Plaintiff, however, cannot rely upon conjecture or speculation to establish such causal connection.  Rather, plaintiff must provide competent proof of the connection between the negligent actions and the injury received.  *Evans v. Liguori, 374 A.2d 774, 777 (R.I. 1977).*

Dropped to its most elementary form, there is absolutely no support for the conclusion that the lack of supervisor on the scene caused Officer Martin to shoot plaintiff decedent.

6.   DISPATCHER WARDYGA

In addition to seeking to recover against the individual officers who had direct contact with plaintiff decedent and their supervisor, plaintiff also bring suit against dispatcher Edward Wardyga.  Plaintiff specifically alleges in the Second Amended Complaint that Dispatcher Wardyga violated the Department Rules and Regulations by failing to dispatch a supervisor to the scene upon receiving the call from decedent's mother describing plaintiff decedent as being "out of his mind" and "talking crazy."  *Plaintiff's Complaint, ¶ 15.*   Plaintiff alleges that the defendant's failure to follow the Rules and Regulations and send a supervisor to the scene was not only negligent leading to his wrongful death but also violated plaintiff decedent's constitutional rights.  *Plaintiff's Complaint, Cts. I and III.*

As noted *infra*, the fact that the failure to dispatch a supervisor violates the Department Rules and Regulations is irrelevant to the determination of whether Dispatcher Wardyga violated plaintiff's constitutional rights.  Section 1983 only imposes liability for violations of rights protected by the Constitution or federal statutes, not for violations of state law. *Snowden v. Hughes, 321 U.S. 1, 11 (U.S. 1944).*  Plaintiff did not enjoy a constitutional right to have a supervisor present at the scene.

In addition, the federal constitutional right cited by plaintiff as against Dispatcher Wardyga is the Fourth Amendment right to be free from unlawful seizure. The undisputed facts utterly fail to support a finding that Dispatcher Wardyga unlawfully "seized" plaintiff depriving him of his constitutional rights.

21

Finally, as noted *infra*, there is no causal connection between the absence of a supervisor at the scene and plaintiff's claimed constitutional injuries.

> **B.    COUNT II & III - R.I.'S WRONGFUL DEATH STATUTE, R.I.G.L. § 10-7-1 ET SEQ BASED ON ALLEGED ASSAULT AND BATTERY BY DEFENDANT OFFICERS MARTIN, LUCCHETTI, DOLAN AND KELLY**

In Counts II & III, plaintiff seeks to recover against the individual officers for the alleged wrongful death of decedent.   Under R.I.G.L. § 10-7-1 "[w]henever the death of a person shall be caused by the wrongful act, neglect, or default of another, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, the person who, or the corporation which, would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured."   In this case, plaintiff relies upon both the allegation that the individual defendants' assaulted and battered plaintiff as well as the claim that they were negligent to support the wrongful death claim.

> 1.    ASSAULT AND BATTERY - OFFICER MARTIN

R.I. law regarding assault requires plaintiff to prove that he was placed in apprehension of imminent harmful or offensive contact.  *Restatement (Second) of Torts, § 24*.  This is a subjective standard that requires a plaintiff to be aware of the imminent contact and actually suffer apprehension at the possibility of such contact.  *Id. at § 27*.  Plaintiff need not establish, however, that he was frightened by the defendant's actions only that he suffered apprehension as a result of the actions.  The apprehension required for an assault is of imminent or immediate bodily harm.  Words alone, therefore, are not sufficient to make a defendant liable for assault.  If, however, the words, together with other acts or circumstances, put the plaintiff in apprehension of imminent harmful or offensive contact, then a defendant may be liable for assault.  *Id. at § 31*.

In order to prove a cause of action for battery, plaintiff must establish the same intent necessary to prove assault, that is: defendant intended to commit a harmful or offensive touching or to create apprehension of the same.  *Id. at § 18(1)(a)*.  Unlike a claim for assault, however, in a claim for battery, plaintiff must also show that there has been a harmful or offensive touching on the part of defendant.  *Id. at § 18(1)(b)*.  Although the plaintiff need not be aware that a touching has occurred in order to recover for battery, the plaintiff must establish that he did not consent to the touching.  Hostile intent toward the plaintiff, or an intent to cause him injury or embarrassment, however, is not necessary in order to establish a claim for battery.  Intent to bring about un-permitted contact is sufficient.

A well-recognized "permitted" contact occurs when a police officer is performing his duties.  As noted *infra*, a police officer can use reasonable amount of force to subdue an individual even if the officer is not acting in self-defense.  *Sheehan v. West, 27 R.I. 84 (1905)*.[7] Such privileged contact relieves the officer from liability for assault and battery.

2.    OFFICERS LUCCHETTI AND DOLAN

Plaintiffs have also brought a claim under R.I.'s Wrongful Death statute against Officers Lucchetti and Dolan based on the officers' alleged assault and battery of plaintiff.  *Plaintiff's Second Amended Complaint, at ¶30-31*.   In Count III, plaintiff likewise alleges that as the result of Officers Lucchetti's and Dolan's negligent conduct, plaintiff "experienced severe pain and suffering and <u>died</u>."  *Plaintiff's Second Amended Complaint, at 34*.  However, it is undisputed that plaintiff died as a direct result of two (2) gunshot wounds fired by Officer Martin.  *Autopsy Report, 6*.  Although Officers Lucchetti and Dolan were on the scene and attempted to apprehend

---

[7]  The Rhode Island Supreme Court has recognized the interrelationship between § 1983 and the common-law tort for assault and battery.  *Dyson v. City of Pawtucket, 670 A.2d 233, 237 (R.I. 1996)*.

plaintiff decedent, it is undisputed that neither Officer Lucchetti nor Officer Dolan discharged their weapon. The medical examiner specifically concluded that the injuries plaintiff decedent suffered prior to being shot were not deadly. *Deposition of Peter Gillespie, M.D. (August 29, 2009), at 37.*

3.    NEGLIGENCE RESULTING IN WRONGFUL DEATH

In Count III, plaintiff likewise alleges that as the result of Officers Martin, Lucchetti and Dolan's negligent conduct, plaintiff "experienced severe pain and suffering and <u>died</u>." *Plaintiff's Second Amended Complaint, at 34.*   Plaintiff thus seeks to recover under R.I.'s Wrongful Death statute for the officers' alleged negligence. Under Rhode Island law, in order to succeed on a claim of negligence, "plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." <u>Selwyn v. Ward</u>*, 879 A.2d 882, 886 (R.I. 2005).*

**C.    COUNT IV -§ 1983 AGAINST CITY**

In Count IV, plaintiff seek to recover against the City of Pawtucket pursuant to *42 U.S.C. § 1983* based on the allegation that the City "developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of plaintiff." *Plaintiff's Second Amended Complaint, at ¶ 37.*   In their "Statement of Claims" submitted to the Court, Plaintiff specifically alleges that the City failed "to properly train its police officers . . . concerning the use of force against an emotionally disturbed individual." *Plaintiff's Statement of Claims, Doc. #5.* In opposition to defendants' Motion for Partial Summary Judgment, plaintiff alleges that there are three (3) areas that provide sufficient evidence by which a jury could find that the City was "deliberately indifferent" such to give rise to a constitutional violation for failure to train and supervise. Plaintiff first maintains that there is sufficient factual basis to support a failure to

train.  Plaintiff also alleges that they have maintained a sufficient case to recover *§ 1983* damages against the City for failure to supervise Officer Martin.  Finally, plaintiff points to the City's subsequent disciplinary investigation of the shooting and the City's indemnification ordinance as evidence of the City's alleged liability.

The starting point in addressing municipal liability under § 1983 is the recognition that the City cannot be held liable based on a theory of *respondeat superior*.  *Monell v. Department of Social Services of City of New York, 436 U.S. 690, 694 (1978)*.  Rather, in order to maintain a *§ 1983* action against a municipality, plaintiffs must establish that a "policy or custom" of the municipality caused a constitutional tort.  *Id.*  Courts have generally recognized four grounds for demonstrating such a municipal policy or custom caused a constitutional injury.[8]  One such ground, which is noted as overlapping with the other three, is premised upon the theory that the municipality's failure to train caused the constitutional injury.  *City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). See also Britton v. Maloney, 901 F.Supp. 444, 450 (D.Mass. 1995) rev'd in part on other grounds, Britton v. Maloney, 196 F.3d 24 (1st Cir. 1999)*.

1.      THE CITY WAS NOT DELIBERATELY INDIFFERENT TO TRAINING

The alleged violation of a plaintiff's constitutional rights caused by a local government's failure to train police officers is actionable under a *§1983* only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact" and where "the identified deficiency in a city's training program [is] closely related to

---

[8] The three other grounds for establishing municipal liability are when 1) the alleged constitutional injury emanates from the enforcement of an unconstitutional ordinance, regulation or written policy; 2) an unwritten or informal municipal policy produces the constitutional violation at issue; or 3) the constitutional injury emanates from an unconstitutional municipal custom that "is so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet [do] nothing to end the practice." *Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989) cert. denied 493 U.S. 820 (1989).  See generally Britton v. Maloney, 901 F.Supp. 444, 449-50 (D.Mass. 1995)*.

the ultimate injury." *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005) citing *City of Canton*, 489 U.S. 378.

In order for a deficient training program to amount to deliberate indifference, the training must be more than merely imperfect and it must be shown that defendant "disregarded a known or obvious risk of serious harm from its failure to develop a training program" that meets adequate standards. *Young*, 404 F.3d at 27-28.  A plaintiff must show that the municipality had "a policy of not taking reasonable steps to train . . . employees" such that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably said to have been deliberately indifferent to the need." *Bordanaro*, 871 F.2d at 1159.  A finding of deliberate indifference requires also that the City disregarded a known or obvious risk of serious harm from its failure to develop a training program. *Young*, 404 F.3d at 28.  Deliberate indifference, requires a showing "'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights.'" *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)). "Rather, deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Id.* (quoting *Thompson*, 245 F.3d at 459.) See also *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F.Supp.2d 45, 63 -71 (D. Me. 2006). *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994) ("[E]vidence of "a known history of widespread abuse sufficient to alert a supervisor to ongoing violations" is one way of demonstrating the need for more or different training").

Thus, "[t]he liability criteria for 'failure to train' claims are exceptionally stringent."

*Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998). "[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Young*, 404 F.3d at 27 citing *Canton*, 489 U.S. at 391; *Grazier v. City of Philadelphia*, 328 F.3d 120, 125 (3d Cir. 2003); *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) *(where town gave police officers some training on handling suspects exhibiting abnormal behavior, argument that even more training should have been given failed).* In fact, the First Circuit has held that "an arguable weakness in police training (or supervision does) not amount to a policy of failure to train arising from deliberate indifference to citizen's constitutional rights." *Burns v. Loranger*, 907 F.2d 233, 239 (1st Cir. 1990), See also *Rodriques v. Furtado*, et al., 950 F.2d 805, 813 (1st Cir. 1991). Also, the fact that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91 (citations omitted) citing *Springfield v. Kibbe*, 480 U.S., at 268 (O'Connor, J., dissenting); *Oklahoma City v. Tuttle*, supra, at 821 (opinion of Rehnquist, J.).

In the instant case, the officers first received training during the officers' Municipal Police Academy before becoming full time officers. According to Capt. Ricciarelli, the Assistant Director of Operations, for the R.I. Municipal Police Academy, training on how to deal with emotionally disturbed individuals is intertwined with virtually all areas of the Academy training including most specifically community policing, stress management, patrol and the end of the session role playing activity. *Deposition of David A. Ricciarelli* (August 24, 2009) at 17-21, 26-27, 68, 71-72, 73. Major Bruce E Moreau, who had been in charge of the Planning and Training Division of the Pawtucket Police Department during the relevant time periods, also testified that

the department provides new hires with additional eighty (80) hours of initial training upon their graduation from the police academy along with an additional eight to nine weeks one-on-one training with a field training officer. *Deposition of Bruce E. Moreau, (July 21, 2009) at 10 &14.* This additional eighty (80) hours of training included reviewing the Department's policy on handling emotionally disturbed individuals. *Id. at 15.* In addition to a line-by-line review of the Department's Rules and Regulation on handling emotional disturbed individuals, the officers were shown a video training tape addressing the issue. In addition, a segment of the use of force training, offered as part of the Department's in-service training program offered to regular officers included dealing with emotional disturbed individuals. *Id. at 21.* A portion of the defensive tactics in-service training also addressed controlled techniques to be used on emotionally disturbed individuals. *Id.* The Department also has use of the Interlocal Trust's firearms training simulator (FATS) in which scenarios involving emotional disturbed individuals are presented to the officers. *Id. 21, 33 & 36.*

Time and again, courts have found that training similar to that offered by the defendant is sufficient to overcome a deliberate indifference claim. For example, in *Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. Mass. 1989),* the First Circuit affirmed summary judgment in favor of the City defendants and found that the evidence relied upon by plaintiff, including the claim that the officers only received four hours of Academy training on the issue, was insufficient to create a triable issue of fact as to whether the City of Springfield had a policy of inadequately training its police officers. *Id. See also Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (training program consisting of attendance at a police academy and two weeks' on-the-job training found sufficient); Williams-El v. Johnson, 872 F.2d 224, 230 (8th Cir. 1989) (finding police academy and on-the-job training adequate for correctional officers with no prior experience); Smith v.*

*Watkins*, 159 F.3d 1137, 1139 (8th Cir. Ark. 1998) (eight weeks of police training classes while serving as an auxiliary officer, completion of the Arkansas law enforcement training academy, and more than 100 hours of police training while serving as an auxiliary officer for the State of Arkansas sufficient).

The Seventh Circuit addressed similar claim of failure to train in *Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. Ill. 1997).[9]  In that case defendant police officers had killed an emotionally disturbed man during a struggle to take him into custody. The estate filed a lawsuit against defendants for excessive force under *§ 1983* as well as a *§ 1983* claim for failure to train claim against the Village of Bensenville.  In support of their claim of failure to train, the plaintiff specifically relied upon the fact that the arresting officers could not recall the training they received in this respect and that the police department did not provide its officers additional specific training beyond that provided during their basic academy training in the handling of emotional disturbed individuals.  *Id. at 1345.*  The basic recruit police training in that case included a block of instruction on handling people who act abnormally.  Similar to the training provided by the City of Pawtucket, the Bensenville Department also provided mandatory post-academy and in-service training which, although was not specifically directed towards abnormally behaving individuals, did include scenarios involving abnormal behavior.  In overturning a jury verdict in favor of plaintiff, the Seventh Circuit held that a training program could not "be deemed deficient so easily."  *Id.*  Rather, the Court held that the fact that the

---

[9] It is also noteworthy that plaintiff criticizes defendants' reliance upon *Palmquist* based on the argument that the Academy training in *Palmquist* has specifically included a "block" on emotionally disturbed individuals.  However, *Palmquist* specifically rejected that proposition that "no "special training = deficient training."  *Palmquist, 111 F. 3d at 1345.*

Department did not have supplemental training in handling abnormally behaving persons did not render its training deficient or give rise to a finding of deliberate indifference.[10]

The same hold true in the instant case.  Even if plaintiff can prove that additional training would have been preferable, such a position is still insufficient to prove "deliberate indifference" on the part of the City.  *See i.e. Id.*; *Calvi v. City of Rockland*, 2006 U.S. Dist. LEXIS 15713 (D. Me. Mar. 31, 2006) (training in arresting individuals with physical disabilities is part of the Maine Criminal Justice Academy's basic law-enforcement program defeated plaintiff's claim against the City).  This is even more apparent in the face the absolute lack of evidence to support a finding that the City endured "'a pattern of similar violations" arising from inadequate training or that the City disregarded a known or obvious risk of serious harm from its failure to develop a training program.  See *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)) and *Young*, 404 F.3d at 28. Not only do the officers receive training on how to handle an emotionally disturbed individual at the Municipal Police Academy but the City followed-up on that training with their own training which includes going line by line over their policy.  While plaintiff may argue that more or different training was preferable, there is no support for a finding that the City disregarded a known or obvious risk in deliberate indifference to the citizen's constitutional rights.  *Young, 404 F.3d at 28; Burns, 907 F.2d at 239.*

> 2.   THERE IS NO BASIS TO SUPPORT A FINDING OF DELIBERATE INDIFFERENCE IN THE SUPERVISION OF OFFICER MARTIN

Plaintiff also seeks to maintain a § 1983 claim against the City based upon the alleged failure to supervise Officer Martin.  In support of this claim, plaintiff cites to four (4) things that plaintiff alleges demonstrates "deliberate indifference" to the proper supervision of Officer

---

[10] The Seventh Circuit also found fault in the conclusion that this alleged training program was the "moving force" or proximate cause of plaintiff's injuries.  *Palmquist, 111 F.3d at 1345*

Martin.  It is first noteworthy that that plaintiff has not brought suit against an individual

supervisor.  Rather, plaintiff seeks to recover against the municipality itself for the alleged

delinquent supervision of Officer Martin.

The elements necessary to prove a failure to supervise claim are somewhat similar to the

failure train.  That is, plaintiffs must "(1) establish . . . defendants' duty to act by proving they

should have known their inadequate supervision was so likely to result in the alleged

deprivations so as constitute deliberate indifference . . .; (2) identify obvious and severe

deficiencies in the state defendants' supervision that reflect a purposeful rather than negligent

course of action; and (3) show a causal relationship between the failure to supervise and the

alleged deprivations to plaintiffs."  _Zainc v. City of Waterbury_, 603 F. Supp. 2d 368, 381 (D.

Conn. 2009) quoting _Reynolds v. Giuliani_, 506 F.3d 183, 193 (2d Cir. 2007). "Plaintiffs must

prove in the end that the state defendants' inadequate supervision actually caused or was the

moving force behind the alleged violations." _Id._  In addition, as with all constitutional claims

against a municipality, in order to succeed on a § 1983 claim against a municipality, plaintiff

must demonstrate that a policy or practice of the municipality was the moving force behind the

constitutional deprivation.  _Monell v. Department of Social Services of City of New York_, 436

U.S. 690, 694 (1978).

In this case, rather than point to a policy or practice of the City, plaintiff relies upon the

City's alleged failure to properly supervise one particular officer.  Although there is no clear

consensus as to how frequently such conduct must occur to amount to a municipal "policy or

practice" it is generally accepted that like a claim of deliberate indifference, in order to prove a

policy or practice there "must be more than one instance." _Thomas v. Cook County Sheriff's_

_Dep't_, 2009 U.S. App. LEXIS 26086 (7th Cir. Ill. Dec. 1, 2009).   "[P]laintiff must demonstrate

that there is a policy at issue rather than a random event. This may take the form of an implicit

policy or a gap in expressed policies, or "a series of violations to lay the premise of deliberate

indifference." *Id.  Burge,* 336 F.3d at 370 (citations omitted) ( *"[J]ust as proof of a custom or*

*practice requires more than a showing of isolated acts, . . . deliberate indifference generally*

*requires that a plaintiff demonstrate "at least a pattern of similar violations").*

      In this case, to support its § 1983 claim based on failure to supervise, plaintiff relies on

the City's perceived failure to require <u>one</u> officer to undergo a fitness evaluation after being told

that he had  been experiencing fatigue and stress of late that had caused him to use a lot of sick

time.[11]  First and foremost, even assuming such acts demonstrates a failure to supervise, such a

random and isolated incident of failing to supervise does not demonstrate the requisite "pattern"

or series of violations. *Alexander v. City of South Bend, 433 F.3d 550, 558 (7th Cir. Ind.*

*2006)("shortcomings in this investigation are not indicative of a custom or policy; rather, they*

*are indicative of one  flawed investigation.").*

      In addition, the "limited" exception for single-incident liability (described *infra, n. 1)*

offers plaintiff no assistance.  As noted, to rely on this exception a plaintiff must prove that the

"highly predictable" consequence of failure to supervise would result in the specific injury

suffered.  *Roberts, 397 F.3d at 295.  See also Brumfield v. Hollins, 551 F.3d 322, 329 (5th Cir.*

*Miss. 2008).*

      In this case, plaintiff relies upon an address included on plaintiff's resume at the time of

his hiring, a single correspondence and Officer Martin's explanation that he had used sick time to

deal with increased stress and fatigue in his life.  Notably, plaintiff does not cite to any on-duty

---

[11] Omitted from plaintiff's rendition is the fact that Officer Martin informed Captain Haberle that he had seen the
department psychiatrist in relation to one of these stress incidents and that Captain Haberle had specifically offered
him additional counseling. *See Witness Statement,(January 19, 2008), Plaintiff's Exhibits in Support of Objection to
Motion for Summary Judgment, Tab 39.*

or off-duty incidents such as overly aggressive behavior or mistreatment of citizens to support

the claim of deliberate indifference.  As previously noted, in order to satisfy the "limited

exception", the officer's actions must be a "highly predictable" consequence of failure to

supervise and a purposeful rather than a negligent course of conduct.  *Id. See also Reynolds v.*

*Giuliani, 506 F.3d 183, 193 (2d Cir. 2007).*

> 3.    THE CITY'S POST-INCIDENT ACTIONS DO NOT GIVE RISE TO LIABILITY FOR
> PLAINTIFF'S CLAIMED CONSTITUTIONAL DEPRIVATION

Plaintiff also argues that the City can be held liable because it was allegedly "deliberately

indifferent" to the officers' actions by virtue of their disciplinary process and indemnification

ordinance after the incident.  Defendants respond that plaintiff's reliance upon the post-event

actions and the indemnification ordinance is misplaced.

First, plaintiff has cited to *Bordanaro v. McLeod, 871 F.2d 1151, 1166-1167 (1st Cir.*

*1989)* for the conclusion that failure to take disciplinary action after an event demonstrates

"deliberate indifference."   However, shortly after the First Circuit decided *Bondanaro*, it issued

its decision in *Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. Mass. 1989).*  In *Santiago*, the

First Circuit reviewed the municipality's failure to discipline an officer for the underlying action

and rejected the conclusion that such an individual disciplinary decision could defeat a motion

for summary judgment.  In rejecting such a claim, the Court reaffirmed its settled precedent "that

the failure of a police department to discipline in a specific instance" is not an adequate basis for

municipal liability under *Monell. Id. citing Kibbe v. Springfield, 777 F.2d at 801, 809 (1st Cir.*

*1985) (sloppy post-shooting investigative procedures which could be said to have encouraged*

*precipitous shooting did not create a sufficient ground for municipal liability); Landrigan v. City*

*of Warwick, 628 F.2d 736 (1st Cir. 1980).* Since *Santiago*, the First Circuit, in *Febus-Rodriguez*,

reestablished the finding that failure to investigate and discipline an office for an underlying

incident, without more, is insufficient to establish civil rights liability on the part of the municipality. *Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 95, n.11 (1st Cir. P.R. 1994) (noting that failure to discipline officer for underlying incident not sufficient to to demonstrate municipal liability).* See also *Schuurman v. Town of North Reading, 1995 U.S. Dist. LEXIS 11164 (D. Mass. June 15, 1995).*

It is also noteworthy that in *Santiago* the First Circuit relied in part on the City defendant's underlying policy of investigating complaints and disciplining officers in appropriate circumstances. *Santiago, 891 F.2d at 382.* In this case, plaintiff does not and cannot challenge the City's clear underlying policy of investigating and disciplining officers in the appropriate circumstances. It is undisputed that the City's disciplinary policy is constitutionally firm. *Accord Schuurman, 1995 U.S. Dist. LEXIS 11164 (D. Mass. June 15, 1995) ("here, as in Santiago, 891 F.2d at 382, the Town of North Reading undisputedly had a policy of investigating citizen complaints that specifically provided for the discipline of police officers where appropriate."); Wisler v. City of Fresno, 2008 U.S. Dist. LEXIS 50843 (E.D. Cal. June 24, 2008) ("Fresno has a policy of investigating instances when its officers use force in order to determine whether the force used was reasonable.. A single instance of an investigation that does not lead to discipline is an isolated incident that does not show a custom or policy of failing to discipline"); Parker v. City of S. Portland, 2007 U.S. Dist. LEXIS 37015 (D. Me. May 18, 2007).*

As noted, in opposition to this well-settled precedent, plaintiff cites to *Bordanaro, 871 F.2d at 1167,* for the conclusion that the delay in the decision of whether to impose discipline demonstrates liability on the part of the City. In addition to the above cited case law to the contrary, there are two additional problems with plaintiff's reliance on *Bordanaro*. First, *Bordanaro* relied upon *Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985), cert. denied,*

*480 U.S. 916 (1986).*  However, as noted by at least one court, *Grandstaff* was decided "before the Supreme Court decisions in *Pembaur, Praprotnik, Harris* and many other Supreme Court cases that elucidated the contours of municipal liability."  *Milam v. City of San Antonio*, 113 Fed. *Appx. 622, 628 (5th Cir. Tex. 2004).*

In addition, plaintiff's reliance on *Bordanaro* is misplaced because rather than finding that such evidence established municipality liability, *Bordanaro* actually was dealing with the admissibility of such evidence at trial.  More specifically, the court "affirm[ed] the lower court's decision that any possible unfair prejudice resulting to the defendant from the introduction of this evidence is outweighed by the probative value it possesses" by holding that "[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Id. (emphasis added).*  In *Bordanaro*, the failure to timely investigate the officers for the underlying incident was weighed with *inter alia* that:

- [i]n the past, discipline had been meted out haphazardly, inconsistently, and infrequently to . . . officers ;.
- the Chief's review of civil grievances filed against [] officers for their misconduct fell well below accepted levels. Indeed, many complaints were placed in a dead letter drawer never to be seen again.  . . .
- The Chief and the Mayor had received oral and written requests for better training and organizational improvements prior to the incident at [issue]. They were aware of the issue, discussed it, and decided to institute no additional training programs. Later requests for better training by Everett police officers were ignored;
- Prior to the incident at the King Arthur Motel, Lieutenant Stewart, the main advocate for better training and guidance among the Everett officers, told both the Mayor and the Chief that something bad would happen if more instruction were not provided to the police force."

*Bordanaro*, 871 F.2d at 1160-1161.

In the instant case, there is no such additional supporting evidence of a deficient disciplinary action.[12]  Thus, in the face of the undisputed fact that the City had a well-established policy of investigating and imposing discipline on officers in the appropriate circumstance, the fact that City has decided to delay any disciplinary decision until the conclusion of the instant action does not establish liability on the part of the City.

Plaintiff's citation to the City's indemnification ordinance in support of a finding of deliberate indifference also lacks legal support.  Notably the only cases cited by plaintiff in support of this position emanate from the Ninth Circuit.  However, cases from other jurisdictions (as well as the Ninth Circuit itself) have held that a punitive damages indemnification policy is not sufficient to assess liability because the indemnification policy cannot be said to <u>cause</u> a constitutional deprivation.  *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. Cal. 1996) citing *Ekergren v. City of Chicago*, 538 F. Supp. 770, 772-773 (N.D. Ill. 1982); *Brown v. City of Chicago*, 573 F. Supp. 1375, 1379 (N.D. Ill. 1983).  "[T]he principles enunciated by the Supreme Court require an assessment of whether the Council's indemnification decisions can be said to be sufficiently "closely related to the ultimate injury" to constitute the "moving force" behind the constitutional violations in dispute." *Hernandez v. Gates*, 100 F. Supp. 2d 1209, 1222 (C.D. Cal. 2000).  However, indemnification decisions are not sufficiently connected to future constitutional torts to permit the suit to go forward.  *Id. at 1220*.  As explained by the *Ekergren* Court, the allegation that the policy of indemnification promoted constitutional violations was "not reasonable because there are too many variables involved." *538 F.Supp. at 773. See also Brown*, 573 F. Supp. at 1375. "Any policy regarding the indemnification of punitive damage

---

[12]  In fact, even in this case, the evidence cited by plaintiff fails to demonstrate even negligent action by the City.  It is undisputed that the City conducted an investigation into the officers' actions but, in light of the pending lawsuit decided to hold off making any final decision or taking any action against the officers until the civil court process had run its course.

awards in past cases is far too nebulous and too far removed from the alleged constitutional deprivation to conclude that an affirmative link could be established between the policy and future constitutional violations." *Hernandez, 100 F. Supp. 2d a 1223.* Thus, allowing plaintiffs to pursue such a theory would be inconsistent with the Supreme Court's repeated admonition that there must be a clear causal connection between the conduct of the defendant and the alleged constitutional violation. *Id.*

As reasoned by the *Hernandez* court, "[i]f, as appears to be the case, the threat of criminal prosecution and imprisonment failed to prevent civil rights abuses of the sort now before this Court, it is not reasonable to assume that a remote decision by the City Council regarding indemnification of civil penalties would have had any impact whatsoever on their conduct. In view of these circumstances, no persuasive argument can be made that the actions of the City Council were the "moving force" behind the constitutional deprivation." *Id. at 1224 citing Monell, 436 U.S. at 694-95.*

Similarly, in the instant case, as a matter of law, the decision to indemnify police officer is too far removed from the underlying illegal act to permit suit to go forward on the theory that indemnification causes constitutional violations.[13]

### D.    COUNT V & VI - NEGLIGENT TRAINING AND SUPERVISION CLAIMS AGAINST JOHN/JANE DOE DEFENDANTS

In Count V and VI plaintiff seeks to bring a *§ 1983* and a state law claim against defendants, "John and Jane Does 1-10," for failure to adequately train defendants Martin, Lucchetti, Dolan and Newman.  Plaintiff's Second Amended Complaint, at ¶ 39-41.   In the first

---

[13]  A number of courts have also concluded that it would be improper to instruct a jury on indemnification ordinance with respect to a compensatory damages award in a Section 1983 context. *See, e.g., Larez, 16 F.3d at 1518-20 (citing Green v. Baron, 879 F.2d 305, 310 (8th Cir. 1989); Griffin v. Hilke, 804 F.2d 1052, 1057 (8th Cir. 1986), cert. denied, 482 U.S. 914, 107 S. Ct. 3184, 96 L. Ed. 2d 673 (1987)); Scherer v. City of New York, 2007 U.S. Dist. LEXIS 68139 (S.D.N.Y. Sept. 7, 2007).*

instance, suit against the unidentified officers cannot proceed to trial. *Stratton v. City of Boston,* *731 F.Supp. 42, 45 (D.Mass. 1989) ("Although the Federal Rules do not explicitly prohibit the use of fictitious names of for defendants, an action may be dismissed if the defendant Is not sufficiently identified to permit service of process.")*. Despite the opportunity to discover the identity of all officers involved in the incident and having filed two Amended Complaints, Plaintiff has not sought to further identify these "John/Jane Doe" defendants. *Williams v. Rodriguez, 509 F.3d 392, 402 (7th Cir. 2007). See also Colon v. Ludemann, 283 F.Supp. 2d 747, 762 (D. Conn. 2003).*

If it is determined that plaintiff may nevertheless pursue such negligent training and supervision claims against the John/Jane Doe defendants, the case law surrounding the claim is similar to the *§ 1983* action against the municipality for failure to train. That is, in order to succeed on a *§ 1983* claim against a superior for failure to train, plaintiff must demonstrate that "a responsible official supervises, trains, or hires a subordinate with <u>deliberate indifference</u> toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999) (emphasis added)*. In addition, "there must be an 'affirmative link' between the street level misconduct and the action or inaction of supervisory officials." *Gutierrez Rodriguez, 882 F.2d at 563.*

In order to maintain a state law claim for failure to train or supervise, plaintiff must demonstrate that defendants failed "to exercise reasonable care in selecting [and retaining] a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's Inc., 474 A.2d 436, 440 (R.I. 1984); Rivers v. Poisson, 761 A.2d 232, 235 (R.I. 2000).* In *Welsh*, the defendant, Pinkerton's, Inc., agreed to provide security guard

services to Welsh for a fee.  The Court stated that the duty owed by Pinkerton to Welsh was "to conduct a reasonable investigation into Lawson's (the security guard hired by Pinkerton) work experience, background, character, and qualifications."  *Id.*  What constitutes reasonable care depends on the risk of harm inherent in the employment.  *Rivers, 761 A.2d at 235.*  "The greater the risk of harm, the higher degree of care necessary to constitute ordinary care."  *Welsh, 474 A.2d at 440.*  The employer's duty does not end upon the hire of the employee.  A duty to retain only those employees who are fit and competent is also imposed on the employer.  *Id. at 441.*

In *Rivers*, the plaintiff received harassing phone calls from the church janitor.  He placed the telephone calls from his home and from a telephone located in the church elevator.  Plaintiff filed a claim against the church alleging, among other things, negligent supervision and retention of the janitor by the church.  The Superior Court granted the church's motion for summary judgment on plaintiff's negligent hiring, supervision and retention claims.  The Supreme Court agreed, ruling that plaintiff had failed to demonstrate any evidence that would allow a reasonable jury to determine that the failure to monitor the janitor's use of the telephone was a breach of ordinary care in supervising a church janitor.  *Rivers, 761 A.2d at 235.*  Plaintiff argued that a janitor should not have been using the telephone.  The Court ruled that this was not enough to impose liability on the church for negligent supervision.  The church was not aware of the telephone calls until the day plaintiff filed her report with the police and the calls stopped on that day.  *Id.*  "Further, there was no evidence to suggest that Poisson's [the janitor] janitorial position necessitated a heightened degree of supervision."  *Id.*

### E.    COUNT VIII -  STATE LAW  LOSS OF CONSORTIUM, ON BEHALF OF MINOR, MATTHEW SWIFT, AGAINST ALL DEFENDANTS

Count VIII contains a claim on behalf of decedent's minor son for loss of consortium in accordance with R.I.G.L. § 10-7-1.2.  Section 10-7-1.2. enables unemancipated minors to

recover damages for loss of parental society and companionship.  *Id. See DesJarlais vs. USAA Ins. Co., 824 A.2d 1272 (R.I. 2003)*.  These claims are derivative in nature and inextricably linked to the action of the injured plaintiff.  *Jameson vs. Hawthorne, 635 A.2d 1167, 1172-73 (R.I. 1994)*.  Thus, the consortium claims of the minor are dependant on the success of plaintiff in the prosecution of his wrongful death claim.  The minor, however, may not recover for loss of consortium stemming from plaintiff 's constitutional claims.  *Tauriac vs. Polaroid Corp., 716 F.Supp. 672, 673 (D. Mass.1989)*.  Consequently, plaintiff must prevail on his state wrongful death claim in order for the minor plaintiffs to proceed with the loss of consortium claim.

A consortium claim is a "secondary layer of tort liability inuring to the benefit of a person whose relationship with the primary victim has been diminished as a result of the defendants' negligence."  *Scott vs. Istar Real Estate Services, Inc., 2005 U.S. Dist. LEXIS 1676 (February 3, 2005)*.  Generally, compensable elements of a loss of consortium claim include the loss of love and affection, the loss of companionship, the loss of material services, the loss of support and in the case of a spouse, impairment of sexual relations.  Therefore, in order to succeed on this claim, plaintiff must prove that he incurred some sort of loss in this regard.  *Jameson vs. Hawthorne, 635 A.2d 1167, 1172-73 (R.I. 1994)*.

### F.    COUNT IX - PUNITIVE DAMAGES AGAINST DEFENDANT MARTIN, LUCCHETTI AND DOLAN.

In Count IX, plaintiff seeks to recover punitive damages against Officers Martin, Lucchetti and Dolan.   A claim for punitive damages is not a cause of action.  Rather, only after a jury has found a defendant responsible for plaintiff's injuries, may the jury, in its discretion, award punitive damages.  As a starting point, it is noteworthy that punitive damages are not recoverable under Rhode Island's wrongful death statute.  *Simeone v. Charron, 762 A.2d 442,*

*449 (R.I. 2000)*.   Thus, if the sole source of liability against the defendants is based on the state law claim for wrongful death, there is no basis for awarding punitive damages.

There are further preconditions to the award of punitive damages under *§ 1983* besides defendants' liability.   First, "absent a constitutional violation, an award of actual compensatory damages is a prerequisite for an award of punitive damages." *L. Sand, et al., Modern Federal Jury Instructions, Matthew Bender & Co. (2005), § 77.01*.   Second, and in this case most importantly, the Supreme Court has made it clear that "an award of punitive damages, as a matter of common law, requires a finding of 'evil motive'" *Id. citing McRoberts Software Inc. v. Media 100, Inc., 329 F.3d 557, 570 (7th Cir. 2003) (emphasis added)*.   The inquiry, then, "should focus on the acting party's state of mind," *Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000)*. Moreover,

> [w]here the underlying liability for deprivation of a federally protected right under § 1983 rests on a finding of intentional conduct, then, the state of mind requirement for the availability of punitive damages limits those damages to that "subset of cases," in which a plaintiff also adduces evidence that permits an inference that the defendant was aware of the risk that those intentional acts would violate federal law.

*Powell v. Alexander, 391 F.3d 1, 16 (1st Cir., 2004)*.

An award of punitive damages is "a discretionary moral judgment" that the defendant has engaged in conduct that is so reprehensible that it warrants punishment. *Smith v. Wade, 461 U.S. 30, 52, 75 L. Ed. 2d 632, 103 S. Ct. 1625 (1983)*.   Punitive damages may be awarded for a civil rights claim if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id. at 56*.   These terms "pertain to the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n,*

*527 U.S. 526, 535, 144 L. Ed. 2d 494, 119 S. Ct. 2118 (1999) (interpreting 42 U.S.C. §*

*1981a(b)(1)).*

Higher still is Rhode Island's standard for the award of punitive damages, whereby the

motive behind the act has to amount to criminality:

> This court and others have held that the party seeking punitive damages has the
> burden of producing evidence of such willfulness, recklessness or wickedness, on
> the part of the party at fault, as amounts to criminality, which for the good of
> society and warning to the individual, ought to be punished. This court has stated
> that for punitive damages to be awarded there must be a showing that the
> defendant acted with malice or in bad faith. Similarly, the United States District
> Court for the District of Rhode Island has stated that under Rhode Island law one
> must allege that the other party acted with the intent to cause harm.

*Palmisano v. Toth*, 624 A.2d 314, 318 (R.I. 1993) (internal citations omitted).

Thus, a jury may award punitive damages only if the defendant acted with malice,

wantonness or willfulness of such an extreme nature as to amount to criminality which, for the

good of society and as a warning to individuals, ought to be punished. *Id.; Morin v. Aetna*

*Casualty and Surety Co.*, 478 A.2d 964, 967 (R.I. 1984). Moreover, punitive damages should be

awarded only if defendant's conduct requires deterrence and punishment over and above that

provided by an award of compensatory damages. *Id.*

## G. QUALIFIED IMMUNITY

The doctrine of qualified immunity plaintiff's constitutional and state law claims is also

at issue in the instant case. *See i.e. Hatch v. Middletown*, 311 F.3d 83 (1st Cir. 2002)

*(confirming the application of qualified immunity to Rhode Island state law claims).* It is well-

settled that "[q]ualified immunity may exist even though in hindsight a court might determine

that the action of the official violated the constitution." *Berthiaume v. Caron*, 142 F.3d 12, 15

(1st Cir. 1998) citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Hatch v. Town of*

*Middletown*, 311 F.3d 83, 90 (1st Cir. 2002) citing *Pontbriand v. Sundlun*, 699 A.2d 856, 867

*(R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999) (applying qualified immunity to state law claims ).*   Thus, even if it should ultimately be determined that decedent's constitutional right has been violated, the defendants may be relieved from liability by the doctrine of qualified immunity.

The doctrine of qualified immunity emanates from the Supreme Court's pronouncements in *Harlow* where the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow, 457 U.S. at 818.*   The purpose behind granting officials such immunity is to allow them to perform their duties and act in areas where clearly established rights are not implicated "with independence and without fear of consequence." *Id. at 819.*   Officials, therefore, enjoy "an immunity from suit rather than a mere defense to liability [which] . . . is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).*   "In the end, the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was "apparent" when undertaken." *Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).*

Recently the First Circuit reaffirmed that "[t]o determine whether a particular officer is entitled to qualified immunity, '[a] court must decide: (1) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).*[14]   The second step has two aspects: (1) "the clarity of the law at

---

[14] This First Circuit has previously articulated qualified immunity analysis as a three-part test. *See, i.e., Bergeron v. Cabral, 560 F.3d 1, 7 (1st Cir. 2009).*   However, recently, the First Circuit adopted the "[Supreme Court's] two-part test and abandoned [the] previous usage of a three-step analysis." *Estrada v. State of Rhode Island,* 2010 U.S. App. LEXIS 2390 (1st Cir. 2010), n. 14 citing *Maldonado, 568 F.3d at 269.*

the time of the alleged civil rights violation" and (2) whether, on the facts of the case, "a reasonable defendant would have understood that his conduct violated the Plaintiffs' constitutional rights."[15] *Id.; see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("[To overcome qualified immunity, t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.")*. "Thus if a reasonable official would not have understood that his conduct violated Plaintiffs' constitutional rights. . . [they] must" be granted qualified immunity. *Estrada v. R.I., 2010 U.S. App. LEXIS 2390, 14-15 (1st Cir. 2010)*.

This involves applying a good faith test that allows questions of qualified immunity to be decided as a matter of law in appropriate cases. *Malachowski v. City of Keene, 787 F.2d 704, 714 (1st Cir. 1986)*. This test requires viewing the official's actions from an objectively reasonable standpoint. The decisive question becomes whether another police officer, standing in the shoes of these defendants, would have concluded that their actions violated a clearly established statutory or constitutional right. *See Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992)*. A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability." *Cookish v. Powell, 945 F.2d 441, 443 (1st Cir. 1991)*. The First Circuit has observed that the "qualified immunity standard 'gives ample room for mistaken judgments' by protecting' all but the plainly incompetent or those who knowingly violate the law.'" *Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)*.

In the instant case, qualified immunity is appropriate in the first instance with regard to Lt. Newman and Dispatcher Wardyga because there is no clearly established right to have a

---

[15] The Supreme Court has granted lower courts the discretion to "put to the side" the first step of this analysis and move on to determine whether the claimed constitutional right is clearly established. *Pearson v. Callahan, 129 S. Ct. 808, 818 (2009)*.

supervisor dispatched to an incident involving an emotionally disturbed individual.  As noted, plaintiff's claim against Lt. Newman and Dispatcher Wardyga is premised solely on their alleged failure to send a supervisor to the scene immediately upon receiving the call for assistance. *Plaintiff's Complaint, at ¶ 15 & 17.*  Plaintiff can not cite to any legal support demonstrating even an arguable constitutional right.  In any event, even assuming that their actions deprived plaintiff of his constitutional rights and/or caused his injuries, it cannot be found as a matter of law, that another individual standing in these defendants' shoes would believe that the failure to immediately send a supervisor to scene would amount to such a constitutional violation.  As noted, in order to reach such a finding, it would have to be assumed that a patrol officer would violate an individual's rights unless a supervisor was on the scene.  There is simply no basis for such an assumption or finding.  Thus, it cannot be said that another officer, standing in the shoes of this officer and dispatcher would view their failure to send a supervisor violated plaintiff's clearly established rights.  As such, Lt. Newman and Dispatcher Wardyga are entitled to qualified immunity from the instant suit.

Defendants submit that Officers Martin, Lucchetti and Dolan are likewise entitled to qualified immunity.  As outlined above, in the first instance, plaintiff fails to meet the first prong and demonstrate that decedent's constitutional rights were violated because the information received by the officers at the scene gave rise to probable cause to take plaintiff into custody for his own safety.  See i.e. R.I.G.L. §. 40.1-5-7(1)(a); *Ahern, 109 F.3d at 817.*  Nevertheless, even if it could be found that the facts do give rise to a finding of a constitutional deprivation, the officers are nevertheless entitled to qualified immunity because there is no basis to find that the right was 'clearly established' at the time of the defendant's alleged violation." *Lopera v. Town of Coventry, 2009 U.S. Dist. LEXIS 83320 (citations omitted).*  "The clearly established prong itself

has two aspects: (1) the clarity of the law at the time of the alleged civil rights violation and (2) whether given the facts of the particular case a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.*

As more fully described above, not only was the law not clearly established at the time of the incident but a reasonable officer standing in the shoes of these officers would not believe that they were infringing upon plaintiff's constitutional rights by trying to take him into custody to get the medical treatment his mother had relayed that he needed.  In fact, other courts have "lamented 'the lack of clarity in the law governing seizures for psychological evaluations," and concluded that "the law was not clear" thus warranting the extension of qualified immunity to officers. *S.P. v. City of Takoma Park, 134 F.3d 260, 267 (4th Cir. Md. 1998) quoting Gooden v. Howard County, 954 F.2d 960, 967-968 (4th Cir. 1992) ("We are aware of no cases that define 'dangerousness' with the requisite particularity or explain what type of evidence would be constitutionally sufficient to establish probable cause of a dangerous condition." Noting that it is "all too facile [to suggest] that the officers should have walked away from the situation because [the plaintiff] evidenced no injuries at the time they were with her [because if] the officers had refused to act until they saw blood, bruises, and splintered furniture, it might have been too late" (internal quotation marks omitted) (first alteration in original)).*

In the face of not only the officer's obligations under *R.I.G.L. § 40.1-5-7* and their community caretaking responsibilities, it was not clearly established that they lacked the constitutional authority to take plaintiff into custody.  More succinctly, another officer standing in the shoes of these officers and knowing that decedent's mother was concerned about her son's size, strength and desire not to be taken into custody, would not believe that their actions amounted to a violation of plaintiff's constitutional rights.  Although plaintiff relies extensively

upon the officer's perceived violation of the Department's policies and procedures, "violation of established procedure alone is insufficient to overcome a qualified immunity claim." *Davis v. Scherer, 468 U.S. 183, 194 (1984) (holding that officials sued for constitutional violations do not lose qualified immunity simply because their actions violate statutory or administrative procedure).*

The instant case is perhaps best be summarized by the Fourth Circuit's comments in *Takoma Park*:

> "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." In other words, to establish liability, [plaintiff] had to allege facts demonstrating that the established contours of probable cause were sufficiently clear at the time of the seizure such that the unlawfulness of the officers' actions would have been apparent to reasonable officers. *City of Takoma Park, 134 F.3d at 266 quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).*

*See also* *Vincent v. Town of Scarborough, 2003 U.S. Dist. LEXIS 20910, 111-112 (D. Me. Nov. 20, 2003)(" a mistake -- even a fatal mistake -- does not form the basis for a Fourth Amendment violation if the use of force is objectively reasonable based on the facts and circumstances known to the officer at the time). See, e.g., Milstead v. Kibler, 243 F.3d 157, 165 (4th Cir. 2001) ("Courts cannot second guess the split-second judgments of a police officer to use deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the officers or others. While we know in hindsight that Officer Kibler mistakenly shot Milstead, instead of Ramey, this mistake does not negate the justification for the use of deadly force where Officer Kibler had an objectively reasonable belief that Milstead was Ramey. The Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful conduct.") (citations and internal quotation marks omitted); Katz, 533 U.S. at 206.*

In the instant case, even given the facts relied upon by plaintiff, a reasonable officer in the shoes of Officer Lucchetti and Dolan would not have known that his actions were unlawful.

*Lopera,* 2009 U.S. Dist. LEXIS 83320.  Consequently, the officers, at a minimum are entitled to

qualified immunity from the instant suit.

**VI.    POSSIBLE EXHIBITS**

A.    Pawtucket Police Department Incident Report Incident #08-851-OF with attached: Narrative for Nichalas J. Laprade; Narrative for Patrol Peter J. Duhamel; Witness Statement Peter Duhamel 2/12/08; Witness Statement Gil Tavares; RILETS/Telecommunications Unit Request for Registration; Witness Statement Noelle Farry; DVSA Reporting Form.

B.     Dispatch Log for 2/12/08 and transcript of same.

C.    All Photographs for 08-856-OF on CD labeled "Swift Photos" 08-856-OF and in print format.

D.    Photograph DSC_0342.JPG. Blood spatter.

E.    Photograph DSC_0388.JPG. Blood spatter.

F.    Photograph DSC_0389.JPG. Blood spatter.

G.    Photograph DSC_0390.JPG. Blood spatter.

H.    Photograph DSC_0392.JPG. Blood spatter.

I.    Photograph DSC_0403.JPG. Blood spatter.

J.    Photograph DSC_0405. Blood spatter.

K.    Photograph DSC.0365.JPG.  Swords and knives on wall.

L.    Photograph DSC.0366. Swords and knives on wall.

M.    Photograph DSC_0368.JPG. Swords and knives on wall.

N.    Videotape of crime scene.

O.    Audio CD's of Pawtucket Police Department radio/telephone recordings February 11, 2008 Incident

P.    Audio CD's of Pawtucket Police Department radio/telephone recordings February 12, 2008 Incident and any transcripts of same.

Q.    Audio CD of State 9-1-1 recordings and transcript of same.

R.      Medical Records and Invoices from Massachusetts General Hospital for Jason
Swift.

S.      Medical Records from Miriam Hospital for Jason Swift.

T.      The handwritten notes of Jason Swift.

## VII.   MOTIONS IN LIMINE

Simultaneously with the filing of the instant Pretrial memorandum, defendants have filed

two (2) Motions in Limine.  One motion seeks the Court's ruling on the presentation of adverse

witnesses.  The second Motion is directed towards excluding the introduction of certain

testimony.

## VIII.   PROPOSED PRELIMINARY JURY INSTRUCTIONS

*Fourth Amendment - Seizure*

1. Under R.I.'s Mental Health Laws police officers have the authority to take individual with

   mental health issues into custody.   Section 40.1-5-7(1)(a) of Rhode Island General Laws

   states that "police officer who believes the person to be in need of immediate care and

   treatment, and on whose continued unsupervised presence in the community would create an

   imminent likelihood of serious harm by reason of mental disability, may make the

   application for emergency certification to a facility."

2. Thus "[p]olice officers have probable cause to "seize" or detain an individual when

   circumstances warrant[] a reasonable belief that the person to be seized does have a mental

   health condition threatening serious harm to himself or others."   *Ahern, 109 F.3d at 817.*

3. In addition, there is a particular exception to the warrant and probable-cause requirements in

   cases involving "special needs, beyond the normal need for law enforcement." *Ahern v.*

   *O'Donnell, 109 F.3d 809, 817 (1st Cir. 1997) quoting Griffin v. Wisconsin, 483 U.S. 868, 873*

   *(1987) (citation omitted).*   That is, police officers have a wide range of responsibilities aside

   from criminal enforcement.   "[They are] expected to aid those in distress, combat actual

   hazards, prevent potential hazards from materializing, and provide an infinite variety of

   services to preserve and protect community safety."   *U.S. v. Rodriguez-Morales, 929 F.2d 780,*

   *784-785 (1ˢᵗ Cir. 1991).*   Courts have labeled this multifaceted role as "community caretaking."

   *Id*.   Indeed, police officers are not only permitted, but expected, to exercise their "community

   caretaking functions, totally divorced from the detection, investigation, or acquisition of

   evidence relating to the violation of a criminal statute." *Cady v. Dombrowski, 413 U.S. 433,*

   *441 (1973).* "In the course of exercising this noninvestigatory function, a police officer may

have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." <u>U.S. v. King</u>, *990 F.2d 1552, 1560 (10th Cir. 1993). See also* <u>Ferreira v. City of E. Providence</u>, *568 F. Supp. 2d 197, 209 (D.R.I. 2008).*

4. "'The ultimate touchstone of the Fourth Amendment, . . is 'reasonableness,' although "searches and seizures inside a home without a warrant are presumptively unreasonable," that presumption can be overcome. For example, "the exigencies of the situation [may] make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." <u>Michigan v. Fisher</u>, *130 S. Ct. 546 (U.S. 2009) citing* <u>Mincey v. Arizona</u>, *437 U.S. 385, 393-394 (1978).*

5. "This "emergency aid exception" does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only "an objectively reasonable basis for believing," that "a person within [the house] is in need of immediate aid." <u>*Id.*</u>

*Excessive Force*

1.  In the instant case, plaintiff alleges that the officers violated Jason Swift's Fourth Amendment right to be free from the use of excessive force during that arrest.  "All persons present in the United States have the legal right, as guaranteed in the Fourth Amendment to the United States Constitution, to be free from unreasonable seizures, which includes the right to be free from unreasonable use of force during an arrest."

2.  In order to find for the plaintiff on the claim of excessive force, you must find: (1) a significant injury occurred, (2) the injury resulted directly and only from the use of force that was clearly excessive to the need, and (3) the excessiveness of the force is objectively unreasonable. *Reese v. Anderson, 920 F.2d 494 (5th Cir. 1991).*

3.  However, I instruct you that "[a] police officer may use that amount of force which is reasonable to make an arrest, or to defend himself or another from bodily harm." *Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 205 (1st Cir. 1990).*

4.  You thus must consider whether the force used by that defendants was reasonable.  The "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the actions of the police officer were 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 205 (1st Cir. 1990).*

5.  The "reasonableness" of the use of force must be judge from the perspective of a reasonable officer under the same circumstances, rather than with the perspective of 20/20 hindsight.  In doing so, you may consider the fact that [police] officers are often forced to make judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation." *Sokolow, 490 U.S. at 7.*

6.  I caution you that "not every push or shove rises to the level of a constitutional violation, and that police officers making arrests are often forced to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly-changing circumstances."   *Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 205 (1st Cir. 1990).*

7.  "The relevant circumstances include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Bastien v. Goddard, 279 F.3d 10, 14 (1st Cir. 2002) quoting Graham v. Connor, 490 U.S. 386, 396 (1989).*

*Deadly Force*

1.  An officer's use of deadly force is subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  The test is whether the officer's conduct was "objectively reasonable," *Graham v. Connor*, 490 U.S. 386, 397 (1989), that is, whether the officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others," *Garner*, 471 U.S. at 3.''  *Berube v. Conley*, 506 F.3d 79, 82-83 (1st Cir. Me. 2007).

2.  The analysis also requires "careful attention to the facts and circumstances of each particular case, including . . . whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 397.

3.  Because police officers may have to make split-second decisions in circumstances that are "tense, uncertain, and rapidly evolving," facts are to be "evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided."  *Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 231 (4th Cir. 2002).

4.  An officer may use deadly force when he has good reason to believe that the suspect presents a threat of serious physical harm to himself or others. *Garner*, 471 U.S. at 11.

*Onlooker Officer Liability*

1. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring. *Anderson v. Branen, 17 F.3d 552, 556 (2nd Cir. 1994).*

2. "However, an onlooker cannot be charged with section 1983 liability for another's sudden, momentary actions." *Noel v. Town of Plymouth, Mass., 895 F.Supp. 346, 352 (D.Mass. 1995) citing Gaudreault v. Salem, 923 F.2d 203, 207 n. 3 (1st Cir.1990) cert. denied, 500 U.S. 956 (1991).*

3. The question becomes whether the defendant officers had a " 'realistic opportunity' to prevent an attack." *Gaudreault, 923 F.2d at 207 n. 3.* Where "the attack came quickly and was over in a matter of seconds" the officer cannot be liable for failing to prevent the same. *O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir.1988).*

*Lt. Newman - Supervisory Liability*

1. Under § 1983, supervisory liability may not be based on the doctrine of respondeat superior, *see* <u>*Monell*</u>, *436 U.S. at 694 n.58*.  That is, you cannot find a supervisor liable simply because he is supervising an individual who may himself violate an individual's constitutional right. Rather, you may only find liability based on the supervisor's own acts or omissions. <u>*Whitfield v. Melendez-Rivera*</u>, *431 F.3d 1, 14 (1st Cir. P.R. 2005)*.

2. A supervisor's action or inaction amounting to deliberate indifference will be found only if "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." <u>*Germany v. Vance,*</u> *868 F.2d 9, 18 (1st Cir. 1989)*.

3. "The affirmative link requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation." <u>*Hegarty v. Somerset County*</u>, *53 F.3d 1367, 1380 (1st Cir. 1995) (internal citations and quotations omitted)*.

4. Indeed, it is very important that the Plaintiff "affirmatively connect the supervisor's conduct to the subordinate's violative act or omission." <u>*Maldonado-Denis v. Castillo-Rodriguez*</u>, *23 F.3d 576, 582 (1st Cir. 1994)*.  In addition, Plaintiff is required to show that the supervisor's "conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." <u>*Germany*</u>, *868 F.2d at 17-18*.

*Assault and Battery*

1. In order to succeed on his assault claim, plaintiff must prove that he was placed in apprehension of imminent harmful or offensive contact. *Restatement (Second) of Torts, § 24*. This is a subjective standard that requires a plaintiff to be aware of the imminent contact and actually suffer apprehension at the possibility of such contact. *Id. at § 27*.

2. Plaintiff need not establish, however, that he was frightened by the defendant's actions only that he suffered apprehension as a result of the actions. The apprehension required for an assault is of imminent or immediate bodily harm. Words alone, therefore, are not sufficient to make a defendant liable for assault. If, however, the words, together with other acts or circumstances, put the plaintiff in apprehension of imminent harmful or offensive contact, then a defendant may be liable for assault. *Id. at § 31*.

3. In order to prove a cause of action for battery, plaintiff must establish the same intent necessary to prove assault, that is: defendant intended to commit a harmful or offensive touching or to create apprehension of the same. *Id. at § 18(1)(a)*. Unlike a claim for assault, however, in a claim for battery, plaintiff must also show that there has been a harmful or offensive touching on the part of defendant. *Id. at § 18(1)(b)*. A

4. Although the plaintiff need not be aware that a touching has occurred in order to recover for battery, the plaintiff must establish that he did not consent to the touching.

5. A well-recognized "permitted" contact occurs when a police officer is performing his duties. As noted *infra*, a police officer can use reasonable amount of force to subdue an individual even if the officer is not acting in self-defense. *Sheehan v. West, 27 R.I. 84 (1905)*. Such privileged contact relieves the officer from liability for assault and battery.

*Municipal Liability*

1. Like the claim against the supervisor,  the City cannot be held liable for constitutional deprivations based on a theory of *respondeat superior*.  <u>Monell v. Department of Social Services of City of New York</u>*, 436 U.S. 690, 694 (1978)*.

2. Rather, in order to maintain a *§ 1983* action against a municipality, plaintiffs must establish that a "policy or custom" of the municipality caused a constitutional tort.  <u>Id.</u>  In this case, plaintiff alleges that the City had a policy or custom of failing to train the officers that caused plaintiff's constitutional injury.

3. A municipality's failure to train police officers is actionable under a *§1983* only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact" and where "the identified deficiency in a city's training program [is] closely related to the ultimate injury." <u>Young v. City of Providence</u>*, 404 F.3d 4, 26 (1st Cir. 2005) citing* <u>City of Canton</u>*, 489 U.S. 378*.

4. In order for a deficient training program to amount to deliberate indifference, the training must be more than merely imperfect and it must be shown that defendant "disregarded a known or obvious risk of serious harm from its failure to develop a training program" that meets adequate standards. <u>Young</u>*, 404 F.3d at 27-28*.

5. A plaintiff must show that the municipality had "a policy of not taking reasonable steps to train . . . employees" such that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably said to have been deliberately indifferent to the need." <u>Bordanaro</u>*, 871 F.2d at 1159*.

6.  A finding of deliberate indifference requires also that the City disregarded a known or obvious risk of serious harm from its failure to develop a training program. *Young, 404 F.3d at 28.*

7.  Deliberate indifference, requires a showing "'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights.'" *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)).

8.  "Rather, deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Id.* (quoting *Thompson*, 245 F.3d at 459.) *See also Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F.Supp.2d 45, 63 -71 (D. Me. 2006). *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994) ("[E]vidence of "a known history of widespread abuse sufficient to alert a supervisor to ongoing violations" is one way of demonstrating the need for more or different training").

9.  Thus, "[t]he liability criteria for 'failure to train' claims are exceptionally stringent." *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998). "[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Young*, 404 F.3d at 27 citing *Canton*, 489 U.S. at 391; *Grazier v. City of Philadelphia*, 328 F.3d 120, 125 (3d Cir. 2003); *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) (where town gave police officers some training on handling suspects exhibiting abnormal behavior, argument that even more training should have been given failed).

10. In fact, "an arguable weakness in police training (or supervision does) not amount to a policy of failure to train arising from deliberate indifference to citizen's constitutional rights." *Burns v. Loranger, 907 F.2d 233, 239 (1st Cir. 1990), See also Rodriques v. Furtado, et al., 950 F.2d 805, 813 (1st Cir. 1991).*

11. Also, the fact that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton, 489 U.S. at 390-91 (citations omitted) citing Springfield v. Kibbe, 480 U.S., at 268 (O'Connor, J., dissenting); Oklahoma City v. Tuttle, supra, at 821* (opinion of Rehnquist, J.).

*Failure to Supervise*

1. The elements necessary to prove a failure to supervise claim are somewhat similar to the failure train.  That is, plaintiffs must "(1) establish . . . defendants' duty to act by proving they should have known their inadequate supervision was so likely to result in the alleged deprivations so as constitute deliberate indifference . . .; (2) identify obvious and severe deficiencies in the state defendants' supervision that reflect a purposeful rather than negligent course of action; and (3) show a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs." *Zainc v. City of Waterbury, 603 F. Supp. 2d 368, 381 (D. Conn. 2009) quoting Reynolds v. Giuliani, 506 F.3d 183, 193 (2d Cir. 2007).*

2. "Plaintiffs must prove in the end that the state defendants' inadequate supervision actually caused or was the moving force behind the alleged violations." *Id.*

3. In addition, as with all constitutional claims against a municipality, in order to succeed on a § 1983 claim against a municipality, plaintiff must demonstrate that a policy or practice of the municipality was the moving force behind the constitutional deprivation.  *Monell v. Department of Social Services of City of New York, 436 U.S. 690, 694 (1978).*

4. Like a claim of deliberate indifference, in order to prove a policy or practice there "must be more than one instance." *Thomas v. Cook County Sheriff's Dep't, 2009 U.S. App. LEXIS 26086 (7th Cir. Ill. Dec. 1, 2009).*

5. "[P]laintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, or "a series of violations to lay the premise of deliberate indifference." *Id. Burge, 336 F.3d at 370 (citations omitted) ( "[J]ust as proof of a custom or practice requires more than a showing of*

*isolated acts, . . . deliberate indifference generally requires that a plaintiff demonstrate "at least a pattern of similar violations").*

*Causation*

1.  In order to succeed on a § 1983 claim plaintiff must show a causal connection between the named defendant's actions and the alleged constitutional deprivation.  *Francis v. Barlow, 2006 U.S. Dist. LEXIS 30394 (W.D. Ky. May 16, 2006) citing King v. Massarweh, 782 F.2d 825, 829 (9th Cir. 1986).*

2.  "That is, a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury."  *Horn by Parks v. Madison County Fiscal Court, 22 F.3d 653, 659 (6th Cir. Ky. 1994).*

3.  To establish causation, a plaintiff must adduce "an affirmative link . . . [a] moving force that animated the behavior . . . that resulted in the constitutional violations alleged." *Deaton v. Montgomery County, 989 F.2d 885, 889 (6th Cir. 1993).*

4.  When the theory of causation is a matter of pure speculation and is nothing more than an hypothetical argument, the pleadings are insufficient to sustain a compensable § 1983 claim.  *Horn, 22 F.3d at 659.*

6.  Under R.I. law, causation is established by competent proof that but for the negligence of defendant, harm to plaintiff would not have occurred.  *Mullaney v. Goldman, 398 A.2d 1133, 1136 (R.I. 1979).*  Stated another way, the negligent act must have played a substantial part in bringing about or actually causing the injury alleged by plaintiffs.

IX.   **PROBABLE LENGTH OF TRIAL**

Defendants estimate that the evidence and testimony will take 5-6 weeks to complete.

X.   **ADDITIONAL MATTERS**

A.   **Proposed Testimony of Dr. Mash**

This Court also requested background information on the proposed testimony of

defendants' expert Dr. Mash.  Dr. Mash's proposed testimony, based on a reasonable degree of

medical, scientific and professional certainty, will be that Jason Swift was in a state of excited

delirium on February 12, 2008.  Dr. Mash will testify that most individuals who experience

excited delirium die at the scene or in immediate police custody or shortly thereafter despite

medical intervention.  Those who do survive usually evidence subsequent metabolic, respiratory,

hepatic, renal and cardiac failure.

The basis for Dr. Mash testimony is premised on the finding that people experiencing

excited delirium display sudden onset of paranoia and alternate between calm behavior and

extreme agitation. When confronted by police, who are invariably called to the scene, the person

intensifies the violence and paranoia. An intense struggle ensues, when the person exhibits

incredible "superhuman" strength and is impervious to the usual police techniques of pain

control, including pepper spray, electric stun guns, and baton strikes. (Ross, 1998; Stratton et al,

2001; Wetli and Natrajan 2005; Grant et al 2009).

Dr. Mash has over twenty-five (25) years of professional experience in the study of

neurochemistry and pathology of drug abuse and sudden death.  Her expert opinions relative to

this case were formed to a reasonable degree of medical, scientific, and professional certainty

based on her review of the autopsy findings, forensic investigation, toxicology results, witness

statements and available medical records from Massachusetts General Hospital.  She has testified

in a number of trials on this issue.  Such testimony was admitted after a Daubert hearing was

conducted and the principles, methodology and reasoning behind the proposed testimony was

found to be scientifically valid and thus admissible.  Dr. Mash relies upon the same the

principles, methodology and reasoning in support of her proposed testimony in the instant case.

### B.   Issues relating to this Court's ruling on Defendants' Motion for Partial Summary Judgment

As the Court is aware, there is currently a Motion for Partial Summary Judgment filed on

behalf of some of the defendants in this action.  This Court's ruling on the various issues raised

in that motion may give rise to the need for defendants to seek further pretrial rulings as well as

giving rise to additional arguments in support of pending Motions in Limine before this Court.

Specifically, this Court's treatment of the claims against the municipality may bear on the

admissibility of certain evidence as well further support Defendants' Motion to Sever, Bifurcate

or seat two juries in the instant case.  Although unlikely, this ruling may impact the witnesses

and exhibits defendants will seek to introduce at trial.  Defendants thus may be seeking leave to

file additional Pretrial Motions and/or supplement pending Motions, or supplement its witness

and exhibits lists depending on this Court's ruling on the pending Motion for Partial Summary

Judgment.

Defendants,
By their attorney,


/s/ Marc DeSisto
Marc DeSisto        (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax:    (401) 272-9937
Email: marc@desistolaw.com

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that the within document has been electronically filed with the Court on

April 1, 2010 and is available for viewing and downloading from the ECF system and that

counsel of record listed below will receive notice via the ECF system.

Max Wistow, Esq. #0330
mw@wistbar.com

Stephen P. Sheehan, Esq. #4030
sps@wistbar.com

_/s/ Marc Desisto_____ _____