UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                     )
NOELLE FARRY, as Administratix       )
of the Estate of Jason Swift,        )
and as Parent and Next Friend        )
of Matthew Swift, a minor            )
                                     )
          Plaintiff                  )
     v.                              )  C.A. No. 08-325 S
                                     )
CITY OF PAWTUCKET, et al.            )
                                     )
          Defendants                 )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

During the early morning hours of February 12, 2008, a mother's call for help put into motion a series of events that ultimately ended with the death of her son at the hands of those sent to answer her call. Despite the number of officers and witnesses present throughout the ordeal, the facts of the incident (which lasted under ten minutes) are hotly contested. What is known is that Jason Swift ("Jason"), naked and unarmed in his apartment, was shot twice and killed after an altercation with law enforcement officers from the City of Pawtucket ("the City"). The officers who were present have testified in unison that Jason lunged at Officer Wallace Martin, which resulted in Officer Martin firing his revolver; however, Plaintiff offers

the testimony of an expert, Dr. Gillespie, who testifies that the officers' account of events is scientifically impossible.

Plaintiff Noelle Farry, in her capacity as Administratix of the Estate of Jason Swift, and as parent and next friend of Matthew Swift, Jason's minor son, filed a Second Amended and Supplemental Complaint against the City (by and through its Finance Director Ronald Wunschel), Lieutenant Michael Newman, Officers Edward Wardyga, Wallace Martin, Anthony Lucchetti, David Dolan, John and Jane Does 1 through 10, all individually and in their representative capacities, alleging constitutional violations, and Monell liability pursuant to 42 U.S.C. 1983, and corresponding state law violations. See Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 690, 694 (1978). The individual Defendants, with the exception of Officer Martin, all moved for summary judgment on all claims (federal and state) in the complaint based on qualified immunity. In response, and prior to the hearing before the Court, Plaintiff voluntarily dismissed her claims against the John and Jane Does, and the federal claims against Defendants Newman and Wardyga, while vigorously opposing all claims of qualified immunity. Defendant City also moved for summary judgment as to the Monell claim, on the basis that the City provided adequate training and supervision and therefore has no liability as a matter of law. In opposition, Plaintiff argues that because the City conceded

2

(for the purposes of summary judgment) that Martin violated Jason's constitutional rights and because it has admitted that Martin acted in conformance with City policy in its Answer, the City cannot avoid going to trial.

I.   Factual Background[1]

Betty Swift ("Mrs. Swift")[2] telephoned 9-1-1 requesting assistance to have her son Jason committed to a hospital because he was "out of his mind." Jason was approximately 6'4" and weighed over 300 lbs. The operator transferred her call to Edward Wardyga, a Pawtucket police officer and the dispatcher on duty. Mrs. Swift informed Wardyga that Jason needed to be taken to the hospital because he was "talking crazy. [Claiming that] he's Jesus Christ and he has to save the world." (9-1-1 Tr., Doc. 53-2.) Wardyga told her not to go back to the apartment, and dispatched officers Wallace Martin and Anthony Lucchetti to respond to the scene. Wardyga did not dispatch a supervisor, although Wardyga's supervisor, Lt. Michael Newman, (an officer with over ten years experience) was present at the station at

---

[1] In some critical areas, the facts are not clear; the Court reviews the record in the light most favorable to the non-moving party, making all reasonable inferences in her favor. Chaloult v. Interstate Brands Corp., 540 F.3d 64, 66 (1st Cir. 2008).

[2] Mrs. Swift is not a party to this case.

the time the call came in and could have been sent.  Newman also heard Wardyga dispatch the officers to the scene.[3]  (Doc. 53-9.)

Wardyga informed the officers that Jason was "acting highly 96," which in police parlance means he was emotionally disturbed.  (Doc. 53-2.)  Wardyga also informed the officers that that Jason was "destroying the house", "may have a knife in possession", and "he is not very friendly with police."  (Id.)

Once Officers Martin and Lucchetti arrived, Mrs. Swift informed them of Jason's prior mental health history, including the fact that he did not like police officers and may feel threatened by their presence.  The officers observed Jason about 30 feet away, as he emerged from the apartment holding a sheathed sword.  The officers drew their weapons and ordered Jason to drop the sword.  Jason immediately dropped his sword and lifted his shirt turning a full circle to show that he had no other weapons.  Mrs. Swift picked up the sword and tossed it over a nearby fence, out of reach.

The first altercation occurred outside the apartment between the officers and Jason.  Mrs. Swift testified in deposition that the officers continued to yell commands, including for Jason to go to his knees and/or lie down, which Jason did not do.  (Doc. 53-13.)  Mrs. Swift also testified that

---

[3] The Pawtucket Police Manual of Procedures 440.09 provides that a supervisor is to be sent in addition to two officers when an emotionally disturbed person is involved.  (Doc. 53-6.)

Officer Martin threw himself at Jason, and when Jason tried to move away he struck Martin in the face with his shoulder, knocking Martin's sunglasses off.[4]  Id.

Officer Martin and Lucchetti, however, stated that Jason attacked Martin by hitting him with a backhand across his face, ripping his sunglasses off, crumpling them up, and throwing them to the ground.  Officer Martin stated that he and his partner stepped back but Jason continued to approach them, so they both responded and tried to restrain him.  The officers responded with chemical spray, and struck Jason numerous times with their batons. (Doc. 53-16.)  Jason was able to escape and run toward his apartment.

The officers entered the apartment building (which contained several apartments) with their guns drawn, following the trail of chemical spray up the stairs to Mrs. Swift's

---

[4] Defendants dispute Mrs. Swift's deposition testimony with an unsigned, unsworn, police interrogation transcript that Defendants include in their Reply brief.  Plaintiffs' object to the transcript as hearsay and argue that normally, an interested witness cannot resist summary judgment by submitting a contradictory statement.  Considering the fact that it is Plaintiff who is trying to defeat the summary judgment motion this argument is somewhat awkward; indeed, Defendants, who are moving for summary judgment, are creating an issue of fact with respect to this issue by asking the Court to consider the contrary statements.  Mrs. Swift's deposition testimony supports the claim that Jason inadvertently knocked off the officer's sunglasses, whereas in the police transcript she allegedly says "Jason sort of slapped the officer."  In any event, because the Court agrees the police transcript is hearsay, the Court will disregard it.

apartment, which was locked.  After hearing yelling and loud noises, and after seeing there was no response to their request that Jason come out, the officers forced entry into the apartment with guns drawn.

In the apartment Jason was alone, unarmed, and completely naked.  The officers testify that at one point Jason put his hands up and looked "sincere" and "scared" and "as if he was going to be extremely cooperative."  Indeed, Officer Lucchetti put in a radio call to his fellow officers that backup could proceed to arrive at normal speed (i.e. without the use of sirens and lights).  Officer Martin testified that after entry, he instructed Officer Dolan (who had arrived after Jason ran upstairs) to handcuff Jason.  The officers testified that Jason resisted, all the while telling the officers that he loved them. Officer Martin, in his statement to the police, indicated that Jason then put Lucchetti in a headlock.  Martin stated that Lucchetti began changing colors, so he proceeded to hit Jason in the head with his baton.  Lucchetti states that Jason had grabbed his shirt but did not get his throat, when Officer Martin started to hit Jason with the baton.  At some point Jason grabbed Martin, who escaped by slipping out of the jacket he was wearing.  After a few minutes, Jason ended up on his knees, sweaty, and bloodied by the officers' blows.

Approximately a minute after Lucchetti's radio call, Officer David Kelley[5] arrived at the scene, immediately making a second radio call requesting immediate rescue. The officers testified in unison that Jason then stood up, outstretched his arms, and lunged at Martin. Officer Martin shot Jason twice, killing him.

To contest this version of Jason's ultimate demise, Plaintiff offers the deposition testimony of her medical expert, Dr. Peter Gillespie. The relevant testimony follows:

> Q. Doctor, I would ask you to assume for the purpose of the questions I am about to ask you that at the time of the shooting Jason Swift was fully upright, that Officer Wallace Martin was the shooter.
> That Officer Martin was also standing upright. That Officer Martin was holding his gun in a classic combat stance with his arms extended, arms basically horizontal to the ground. That at the time of both shots Officer Martin and Mr. Swift were on the same level.
> And I would like to assume that Officer Martin when he fired both shots was aiming for the center mass of Mr. Swift's chest. And with those assumptions in mind my question is do you have an opinion to a reasonable degree of medical certainty whether the wounds noted in the autopsy performed on Jason Swift, specifically the gunshot wounds, could have been produced by shots being fired from those relative positions?
>
> . . . .
>
> A. No. It is my opinion that is not possible.
>
> Q. Could you explain why?

---

[5] Although named in the original Complaint, Officer David Kelley is no longer a defendant in the case.

MR. DESISTO:  Same objection.  Go ahead.

THE WITNESS:  Because of the angles of the gunshot wounds through the body.  They are actually fairly steeply downward inside the body. So two people standing on level ground facing each other with a police officer using that shooting stance, the angles, they don't match. You can't produce those kind of angles like that.

(Doc. 53-32, Dep. of Peter Gillepsie, MD.)  Unsurprisingly, given this factual dispute, Officer Martin does not join the other Defendants' motion for summary judgment on Plaintiff's claims.

## II.  Standard of Review

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (internal quotation marks and citation omitted), and it is "material" "only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996).  As noted above, the Court views the record in the light most favorable to the Plaintiff, and must draw all reasonable inferences in her favor.  See Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004). Plaintiff bears the burden of proof at this stage, and the

"evidence adduced on each of the elements of [her] asserted cause of action must be significantly probative in order to forestall summary judgment." Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007).

III. Analysis

    A.   Is the City precluded from moving for summary judgment based on the pleadings?

In her Second Amended Complaint Plaintiff alleged:

> 10.  At all relevant times, Defendants Martin, Lucchetti, Dolan, Wardyga, Newman and John and Jane Does 1 through 10 were acting under color of state law and within the scope of their employment, and were in compliance with the actual customs, policies, practices and procedures of Defendant City of Pawtucket.

Second Am. Compl. ¶ 10.  This well-crafted allegation sought to highlight a potential conflict facing the City of Pawtucket if it insisted on marching in lock-step with the individual co-defendants.  The City, despite being acutely aware of the problem posed by this particular allegation, answered in unison with co-defendants:

> 8.  These defendants admit the allegations contained in paragraph 10 of that portion of plaintiff's complaint entitled "parties" only to the extent that on February 12, 2008 during the attempt to take Jason Swift into custody defendants Martin, Lucchetti, Dolan, Wardyga and Newman were acting under color of law and within the scope of their employment, but, make no response to the remaining allegations in paragraph 10 and leave plaintiff to her proof of same.

Defs.' Ans. to Second Am. Compl. ¶ 8.   Federal Rules of Civil Procedure 8(b)(6) provides that "[a]n allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is required and the allegation is not denied. If a responsive pleading is not required, an allegation is considered denied or avoided."   Plaintiff argues that Defendants' response is "impermissible hedging" and constitutes an admission.   See Mahanor v. United States, 192 F.2d 873 (1st Cir. 1951) (where Defendant did not flatly admit allegation in the complaint, nor stated that she was without knowledge or information sufficient to form a belief as to the truth of the averment, but recited that she "neither admits nor denies the truths of the allegations of this paragraph and demands that the plaintiff prove said allegations" this constitutes an admission).

The City readily acknowledged at the hearing that it cannot argue, at the summary judgment stage, that Officer Martin did not violate Jason's constitutional rights (the dispute of fact here being obvious).   Plaintiff argues that by "making no response" where it is alleged that the officers were "in compliance with the actual customs, policies, practices and procedures of Defendant City of Pawtucket," the City has made an admission, because the allegation was not denied and, therefore,

the City is not entitled to summary judgment on the Monell claims.

In § 1983 claims municipal liability cannot be based upon a theory of respondeat superior; however, liability may exist when a municipal custom or policy causes the constitutional injury. Liability may be proved by several theories, including where (1) the municipality's failure to train causes the constitutional injury; (2) the alleged constitutional injury emanates from the enforcement of an unconstitutional ordinance, regulation, or written policy; (3) an unwritten or informal municipal policy produces the constitutional violation at issue; or (4) the constitutional injury emanates from an unconstitutional municipal custom that is "so well-settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet [do] nothing to end the practice." See Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989). So here, where Plaintiff contends the City is liable for failure to train, failure to supervise, and for policies or customs that caused the constitutional violations; and where the City concedes for the purposes of this motion, that whether Officer Martin committed a constitutional violation is a question of fact to be resolved at trial, and where the City has admitted that Officer Martin acted in conformance with City policy (obviously hoping that Martin will

be vindicated for his actions at trial), summary judgment is simply not possible.

At the hearing, the Plaintiff and the Court noted that Defendants had the option to amend their Answer, in order to allow the City to deny that the officers alleged conduct conformed to City practice and policy (while the officers would maintain that they did conform). This would allow the City to argue that the there is no City policy or custom that caused Jason's injury, even if Martin is found to have violated Jason's rights. The City has repeatedly declined to exercise this option.

The City asks the Court to interpret its Answer as neither "conclusively establish[ing] liability on the municipality [n]or mak[ing] it a question of fact dependent on the outcome of the officers conduct[.]" (Tr. at 4:4-7, Jan. 25, 2010.) The City then questions whether it is ever possible to avoid Monell liability when the conduct of the official is disputed, but the City believes that conduct was proper (at least until proven otherwise)? It argues that to interpret its pleading as an admission means that "a municipality can never move for summary judgment on this issue if that pleading is put in a complaint and it's tied into the conduct of an officer, which is a question of fact." (Tr. at 4:23-5:2.)

12

The question may be a good one but the conundrum the City faces is not one that the Court, or Plaintiff, has created. The City has chosen not to provide separate counsel for the officers and not to answer separately from them. The City has chosen to pursue a strategy where it maintains a joint defense that the officers acted appropriately, even though the officers' actions are hotly disputed.

Plaintiff relies upon Kersh v. Derozier, 851 F.2d 1509 (5th Cir. 1988), to support her position that this admission, together with the concession that there is a question of fact as to the officer's liability, precludes summary judgment on the Monell claims. In Kersh, the parties entered into a pre-trial stipulation that the officers "were in compliance with the actual customs, policies, practices and procedures of Defendant City of Troup." Id. at 1512. The Fifth Circuit affirmed the trial court ruling that if the individual officers were found liable by a jury that would "automatically trigger" the City's liability. The Court then held it was much too late to allow the defendant to withdraw from the stipulation or to have it disregarded because "Kersh was entitled to try his case on the assumption that he need not prove the facts to which the parties stipulated. It is much too late to change these ground rules." Id. at 1513.

Although not on all fours with the present case, <u>Kersh</u> is persuasive. Where Defendant has admitted in its Answer that the officers complied with the actual customs, policies, practices and procedures of Defendant City of Pawtucket, yet the officer's conduct is disputed, summary judgment on Plaintiff's <u>Monell</u> claims must be denied.[6]

B.   Qualified Immunity: Lucchetti and Dolan

For the first time in their Reply brief, Defendants Lucchetti and Dolan, both officers that were present at the time of Jason's death, raise the defense of qualified immunity to the § 1983 constitutional claims brought against them.   Local Rule Cv 7(b)(2) provides, "[a] reply memorandum shall consist only of a response to an objection and shall not present additional grounds for granting the motion, or reargue or expand upon the arguments made in support of the motion."

---

[6]   Moreover, the Court reserves judgment for the time being on the question of whether the City may find a way to contest <u>Monell</u> liability in the event the officers are found liable at trial in spite of the admission in its answer.   In addition, Defendants' have not contested the negligence claims against the City and so these claims are preserved for trial.   Plaintiff's secondary claim against the City, in the event the officers were granted qualified immunity even though they committed constitutional violations, is that state law would potentially hold the City liable on a theory of <u>respondeat</u> <u>superior</u>.   <u>See</u> <u>Napier v. Town of Windham</u>, 187 F.3d 177 (1st Cir. 1999).

14

Plaintiff, apparently anticipating this defense,[7] responded in her sur-reply and both parties argued the issue before the Court during hearing.  Recently, the United States Supreme Court reaffirmed:

> Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis deleted). Indeed, we have made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." Anderson v. Creighton, 483 U.S. 635, 640, n.2 (1987). Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

Pearson v. Callahan, 129 S. Ct. 808, 815 (2009).  Given this clear guidance from the Supreme Court that qualified immunity

---

[7]  Indeed, footnote 12 in Plaintiff's Opposition to Defendants' Summary Judgment motion states "For example, Defendants Lucchetti and Dolan do not assert their affirmative defense of qualified immunity in support of their motions for summary judgment.  Accordingly, that issue is not addressed by Plaintiff."  Defendants stated that they waited until their Reply to assert this defense (and then only against the §1983 claims and not the assault and battery and negligence/wrongful death claims) because "plaintiff shies away from the previous position that Officer Martin 'executed' decedent. . . . Thus, defendants now submit that the onlooker officers at a minimum are entitled to qualified immunity."  (Defs.' Reply Mem. at 17 n.7.)  Lucchetti and Dolan briefly argue with respect to Plaintiff's negligence and assault and battery claims that because they did not actually shoot Jason, the Court should dismiss the claims as a matter of law.  However, since it is clear that Plaintiff's state law claims are broader than Martin's act of shooting Jason, including Lucchetti and Dolan's use of chemical spray, batons, and other physical force, the Court rejects this argument.

should be dealt with at the "earliest possible stage," it is in the interest of all the parties and judicial economy to consider the issue now.  Id.

Qualified immunity protects public officials from suit for reasonable mistakes in judgment as to the lawfulness of an act.[8] However, there is no immunity for "the plainly incompetent or those who knowingly violate the law." Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).  Here, Plaintiff claims that Defendants violated Jason's Fourth Amendment rights because the officers lacked probable cause to arrest him; they used, and did not protect him from, the use of excessive force; and they forced entry into his home without a warrant.

Determining whether a public official is entitled to qualified immunity is a two-step inquiry. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  Under this test, "[a] court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at

---

[8] Qualified immunity is an affirmative defense and the burden belongs to the defendant asserting it. See Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982) (citing Gomez v. Toledo, 446 U.S. 635, 639-641 (1980)).

the time of the defendant's alleged violation."[9] Maldonado, 568 F.3d at 269 (citing Pearson, 129 S. Ct. at 815-16).

The second, "clearly established" step itself "has two aspects: (1) the clarity of the law at the time of the alleged civil rights violation and (2) whether given the facts of the particular case a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights" (which is sometimes referred to as "objective reasonableness"). Lopera v. Town of Coventry, 652 F. Supp. 2d 203, 211 (D.R.I. 2009). A negative answer to either question results in a finding of qualified immunity for the official asserting the defense. Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001).

Because "[c]ourts need not address these questions in order[,]" the Court will first turn to the question of whether the rights alleged to be violated were clearly established. Walden v. City of Providence, 596 F.3d 38, 52 (1st Cir. 2010) (citing Pearson, 129 S.Ct at 818 and Maldonado, 568 F.3d at 269-270).

---

[9] Furthermore, this Court has previously noted that in some cases "the two-step analysis [often] blends together." Lopera v. Town of Coventry, 652 F.Supp.2d 203, 212 (D.R.I. 2009) (citing Anderson v. Creighton, 483 U.S. 635, 648 (1987) (Stevens, J., dissenting) (noting the "double standard of reasonableness" that apparently applies in Fourth Amendment cases where qualified immunity is invoked)).

   1.   Clearly Established Law (and Objectively
        Reasonable Conduct)

The clearly established step addresses "whether the state of the law at the time of the putative violation afforded the defendant fair warning that his or her conduct was unconstitutional." Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004) (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).   Where the law is not sufficiently clear to provide such warning to an officer that he or she is violating plaintiff's rights, qualified immunity is appropriate; however, if the law is clearly established, the Court then considers whether the officers conduct was, nevertheless, objectively reasonable.

While the question of whether the law was clearly established is often said to be a pure question of law, see Walden, 596 F.3d at 54 ("the second part of the test and specifically [] whether the right in question was so clearly established as to give notice to defendants that their actions were unconstitutional in 2002. . . . is a question of pure law"), the resolution of the legal question often depends heavily upon the facts in Fourth Amendment cases and "[c]areful attention also must be paid to the factual nuances of the case, so as to properly define the right at issue." Lopera, 652 F.Supp.2d at 213 (citing Wilson v. Layne, 526 U.S. 603, 615 (1999) and Bergeron v. Cabral, 560 F.3d 1, 11 (1st Cir. 2009)).

18

Recently in _Walden_, the First Circuit framed the issue at stake in the "clearly established" step as whether "in 2002, public safety employees, like plaintiffs, had a clearly established right under the Fourth Amendment not to have calls made at work recorded." 596 F.3d at 38. After redefining the right to more narrowly fit the factual context of the case, the Court concluded that there was no clearly established right because "[t]here were no Supreme Court cases, no 'cases of controlling authority in [plaintiffs'] jurisdiction at the time of the incident,' and no 'consensus of cases of persuasive authority' showing that plaintiffs' asserted Fourth Amendment rights were clearly established in 2002." _Id._

Although _Walden_ could be interpreted as requiring Plaintiff to provide precedent on point with respect to the specific right claimed, previous First Circuit case law indicates this would be reading too much into the holding. "[T]his requirement does not imply that the relevant case law must be particularized to address the alleged violation. Rather, once the right allegedly violated has been defined, the court must examine whether 'the unlawfulness of particular conduct will be apparent _ex ante_ to reasonable public officials.'" _Jennings v. Jones_, 499 F.3d 2, 17 n.18 (1st Cir. 2007) (emphasis added).[10]

---

[10] Common sense also suggests that the facts of a given case may be so unique so as to not lend themselves neatly to finding

There are three claimed constitutional right violations here and the issue of whether the law was clearly established for each claim must be evaluated separately.

a.   Probable Cause to arrest Jason

The question properly framed is this: Did an emotionally disturbed individual have a clearly established right, in 2008, not to be seized by officers Lucchetti and Dolan once he became cooperative and dropped his threatening weapon?  The Court rejects Plaintiff's contention that Jason had a clearly established right not to be seized in these circumstances.  When considering whether an arrest is justified, the proper inquiry is whether probable cause existed at the moment the arrest was made, based on the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information.  Ahern v. O'Donnell, 109 F.3d 809, 817 (1st Cir.

---

another case exactly on all fours.  See, e.g., United States v. Lanier, 520 U.S. 259, 271 (1997); Jennings v. Jones, 499 F.3d 2 (1st Cir. 2007); Limone v. Condon, 372 F.3d 39 (1st Cir. 2004). Indeed, it would make little sense to punish a claimant merely because most cases do not survive long enough within a court of law to bear the fruit of a scholarly opinion.  Moreover, "[i]t follows logically that, in some situations, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." Limone, 372 F.3d at 48 (quoting Lanier, 520 U.S. at 271).  In those cases, the lack of prior legal precedent with precisely corresponding facts would be immaterial.  Id. (holding that "plaintiffs' inability to identify a pre-1967 scenario that precisely mirrors the scandalous facts of this case [does not] ensure the success of the appellants' claims of qualified immunity").

1997) (citing <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)).  This test applies with equal force when the seizure is not an arrest for criminal activity.[11]  <u>Id.</u>  Indeed, the cornerstone of any Fourth Amendment inquiry centers on the reasonableness of the officers' actions.

Plaintiff relies upon <u>Fisher v. Harden</u>, 398 F.3d 837 (6th Cir. 2005), to argue that the officers violated Jason's clearly established right not to be arrested without probable cause. There, the Sixth Circuit ruled there was no probable cause to restrain an elderly man who officers thought might be suicidal. The facts in <u>Fisher</u> revealed that a call came in to the officers that a man with a shotgun was suicidal.  The officers forced the noticeably elderly man to lay face-down on the road after he had dropped the shotgun, causing him to suffer from a heart attack. Plaintiff argues that like the man in <u>Fisher</u>, here, Jason complied and dropped his sword, becoming completely harmless.

It is true that Jason cooperated in that he dropped the sword he was carrying.  But as Defendants fairly note, courts have lamented "the lack of clarity in the law governing seizures for psychological evaluations," <u>S.P. v. City of Takoma Park</u>, 134

_____

[11]  Defendants also point to their "community caretaking" function and specifically, R.I. Gen. Laws 40.1-5-7(a)(1), which provides that a "police officer who believes the person to be in need of immediate care and treatment, and one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, may make the application for emergency certification to a facility."

F.3d 260, 266 (4th Cir. 1998) (internal quotations and citation omitted), and concluded that "the law was not clear" thus warranting the extension of qualified immunity to officers.  See Gooden v. Howard County, 954 F.2d 960, 967-968 (4th Cir. 1992); see also Ahern, 109 F.3d at 817 (considering a Massachusetts commitment statute and stating that probable cause applies and there must be "circumstances warranting a reasonable belief that the person to be seized does [] have a mental health condition threatening serious harm to himself or others"); Maag v. Wessler, 960 F.2d 773 (9th Cir. 1991) (probable cause to take defendant into custody for a medical evaluation).

Taking all of the facts and circumstances as they were known to the officers at the time of the incident, it cannot be said that the law was so clearly established that a person in Jason's condition and circumstance had right not to be seized, and that officers violated that right.  At the moment officers decided to seize him, Jason had demonstrated he was potentially a threat where he had destroyed his mother's apartment while wielding a sword (which was enough to have his mother call 9-1-1 and flee from her home).  Moreover, even if the law was clearly established, officers Lucchetti and Dolan acted in an objectively reasonable manner in attempting to secure the scene by placing Jason in custody (if only temporarily).  For all of

these reasons, qualified immunity for officers Lucchetti and Dolan is appropriate on this claim.

      b.  <u>Warrantless Entry</u>

Plaintiff's next claim relates to the entry by these officers into the apartment after Jason broke free from the officers when they attempted to place him under custody. The question is: did an emotionally disturbed individual have a clearly established right, in 2008, for officers not to enter his locked apartment without a warrant after he resisted arrest and fled there? Generally, there is a presumption that entry into a home without a warrant is an unreasonable constitutional violation, <u>see</u> <u>Payton v. New York</u>, 445 U.S. 573, 586-587 (1980), however, certain exceptions to the rule which may be applicable in the particular circumstances here, could overcome the presumption of unlawfulness. In particular, Defendants argue that Jason did not have a clearly established right because warrantless entry is permissible when effectuated to render "emergency aid" and officers may "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." <u>Michigan v. Fisher</u>, 130 S. Ct. 546 (2009). Defendants also argue that Mrs. Swift gave her implied consent to enter her apartment when she requested assistance over the phone. <u>See</u> <u>United States v. Matlock</u>, 415 U.S. 164, 171 n.7 (1974) (government proved by

preponderance of the evidence that co-inhabitant's voluntary consent to search the east bedroom was legally sufficient to warrant admitting into evidence the money that was found, against the defendant who also lived there). Plaintiff, relying upon Georgia v. Randolph, contends that Jason refused any consent that his mother allegedly gave and a physically present co-occupant who refuses entry renders the officers' entry and search invalid. Georgia, 547 U.S. 103 (2006).

The record, however, is unclear with respect to the factual basis for why the officers believed this represented an "emergency situation" requiring their immediate assistance and/or protection, whether Jason's mother actually consented to warrantless entry of her home, and whether Jason actually refuted that consent. Plaintiff also argues that the situation changed once Jason broke free and he retreated to the apartment; that the officers should have treated Jason as a "barricaded person" and followed the procedures in their policy manual to that effect. It is not clear to the Court at this time whether, if this contention is correct, it would change the constitutional framework – that is, once a person is barricaded in a home, and possibly a danger to himself, does the warrant requirement even apply? Could this be considered "hot pursuit" after the struggle with officers outside? Does the barricading vitiate any prior consent of Jason's mother? Once the facts are

more clearly developed at trial, not only will the Court be able to more precisely define the contours of the law that applies here, but it will also be in a better position to answer whether the actions of the officers were objectively reasonable even if they violated clearly established law.

Therefore, based on the many material facts that are in dispute, the Court is not able to conclude precisely what legal standards should frame the inquiry, nor whether, as a matter of law, the officers acted in an objectively reasonable manner. For these reasons, summary judgment must be denied on this claim at this time; however, it is worth emphasizing that qualified immunity may well be appropriate, and therefore, Defendants may reassert their qualified immunity motion after the close of Plaintiffs' case, in a Rule 50 motion.

c.   <u>Excessive Force</u>

Plaintiff's final claims concern the conduct of the officers in their attempt to place Jason into custody, raising the questions: did an emotionally disturbed individual have a clearly established right, in 2008, to not have chemical sprayed at him or not to be hit with batons by the officers, when he cooperated and threw down his sword, but physically resisted arrest?  And, did he have a clearly established right to the use of less than deadly force against him when he was unarmed and resisted arrest in his apartment?  Plaintiff alleges that the

officers used excessive force both outside and inside the apartment, and that they are liable for Officer's Martin's use of lethal force because they did nothing to prevent it. Speaking generally, the right to be free from excessive force is clearly established. Landrigan v. City of Warwick, 628 F.2d 736, 741-42 (1st Cir. 1980) (citing United States v. Villarin Gerena, 553 F.2d 723, 724 (1st Cir. 1977); Clark v. Ziedonis, 513 F.2d 79, 80 n.1 (7th Cir. 1975); Jenkins v. Averett, 424 F.2d 1228, 1231-32 (4th Cir. 1970) (discussing constitutional right to be free from unreasonable interference by police)). Defining Jason's right within the context of the facts of this case, however, requires the Court to consider the events outside the house separately from the shooting, which occurred inside. The task is difficult, because once again, the facts are far from clear.

The distinction between excessive and permissible force turns on whether the level of force used was reasonable. Officers often "make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97 (1989). Certainly, "[i]n making an arrest, a police officer has 'the right to use some degree of physical coercion or threat thereof to effect it'" and "the use of force is an expected, necessary part of a law enforcement

officer's task of subduing and securing individuals suspected of committing crimes." _Jennings_, 499 F.3d at 11 (quoting _Lee v. Ferraro_, 284 F.3d 1188, 1200 (11th Cir. 2002)).

The test for determining whether the use of force was excessive under the Fourth Amendment is whether, under the circumstances confronting the defendant at the time that he acted, "no objectively reasonable officer would have used" the same degree of force. _Isom v. Town of Warren_, 360 F.3d 7, 12 (1st Cir. 2004); _see_ _Napier v. Town of Windham_, 187 F.3d 177, 183 (1st Cir. 1999) ("[T]he relevant inquiry [in excessive force cases] is whether no reasonable officer could have made the same choice under the circumstances." (internal quotation marks omitted)). Therefore, it is apparent that in order to determine whether that right was clearly established in the case law, the Court must turn to the facts at hand including, "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [wa]s actively resisting arrest or attempting to evade arrest by flight." _Jennings_, 499 F.3d at 11 (internal quotation marks and citation omitted).

The Court is unable to reach a conclusion as to qualified immunity on the excessive force claims because the facts are seriously contested, including precisely what Jason was doing at the time the force was applied. Depending upon whether Jason

27

simply was not complying with the officers' verbal commands, or was instead attacking them at the moment the officers used non-deadly and later deadly force, the result could change.  See Tennessee v. Garner, 471 U.S. 1 (1985) (deadly force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others); Jennings, 499 F.3d at 16 (relying upon Smith v. Mattox, 127 F.3d 1416 (11th Cir. 1997) to hold that for purposes of qualified immunity analysis, the law was clearly established "that it was unconstitutional for police officers to increase their use of physical force after an arrestee who has been resisting arrest stops resisting for several seconds and warns them that they are hurting his previously injured ankle"); State v. Gelinas, 417 A.2d 1381 (R.I. 1980) (noting under Rhode Island law that defendant has right to self-defense when excessive force by an officer is used against him); Shoultz v. State, 735 N.E.2d 818 (Ind. App. 2000) (holding under Indiana law a citizen is permitted to resist arrest when unlawful means like excessive force are used).

The same conclusion applies with respect to Lucchetti's and Dolan's liability for Officer Martin's use of deadly force.  It is undisputed that Officers Lucchetti and Dolan did not shoot Jason, but "a police officer has a duty to intervene in cases in

which a fellow officer uses excessive force because his office carries with it an affirmative duty to act." Davis v. Rennie, 264 F.3d 86, 114 (1st Cir. 2001). Immunity, however, still may shield Defendants Lucchetti and Dolan, because intervention is not required if the officers did not have a realistic opportunity to intervene. See Noel v. Town of Plymouth, 895 F.Supp. 346, 352 (D. Mass. 1995); cf. Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (stating that "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise").

Whether Jason had a clearly established right to be free from deadly force and whether time existed for intervention cannot be determined at this stage, so summary judgment must be denied with respect to Plaintiff's claims of excessive force.

C.   Qualified Immunity:  Wardyga and Newman

Plaintiff's remaining state law claims against the dispatcher, Wardyga, and his supervisor, Newman, sound in negligence and wrongful death for the distant role the officers may have played in Jason's death. In Rhode Island, qualified immunity may be a defense to state law claims. Hatch v Town of Middletown, 311 F.3d 83, 89-90 (1st Cir. 2002) (discussing Rhode Island Supreme Court cases). Plaintiff contends that there is

no qualified immunity where Newman and Wardyga had a ministerial function to follow the Manual of Procedures, which required them to dispatch a supervisor in scenarios with emotionally disturbed individuals.   See Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999) (citing Harlow v Fitzgerald, 457 U.S. 800, 818 (1982)); see also Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) (discussing qualified immunity for acts performed in good faith).   Defendants, however, rely upon the Supreme Court's decision in Davis v Scherer, 468 U.S. 183 (1984), to argue that Plaintiff is impermissibly broadening the scope of the "ministerial duty" exception to qualified immunity.   Id. at 196 n.14.

Recently, in Lopera, this Court confronted a similar issue and found Davis to be dispositive.   Lopera, 652 F.Supp.2d 216 (quoting Davis, 468 U.S. at 194 (the Court noted that "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision")).   In Davis, the Supreme Court held that "neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation – of federal or of state law – unless that statute or regulation provides the basis for the cause of action sued upon." Davis, 468 U.S. at 194 n.12.

The same standard applies here, where Plaintiff's state law claims do not arise out of the alleged policy violation by Defendants regarding whom to dispatch.   Just as the plaintiff in Davis made "no claim that he is entitled to damages simply because the regulation was violated," neither does Plaintiff make such a claim here.   Id. at 196-97 n.14.   Thus, this is precisely the type of situation where a violation of a technical rule does not lift the cloak of qualified immunity, and therefore summary judgment for Defendants Wardyga and Newman is appropriate.

IV.  Conclusion

For the reasons stated herein:

The Court DENIES summary judgment for the City of Pawtucket.

The Court GRANTS summary judgment in favor of Lucchetti and Dolan on grounds of qualified immunity as to Plaintiff's federal claim for lack of probable cause, but DENIES Defendants' motion with respect to Plaintiff's federal claims for warrantless entry and excessive force.

The Court GRANTS summary judgment in favor of Newman and Wardyga on the basis of qualified immunity as to Plaintiff's state law claims.

Therefore, Plaintiff's claims against Officer Martin, the City of Pawtucket, Plaintiff's § 1983 claims for warrantless

entry, excessive force, and her state law claims for assault and battery and negligence/wrongful death against Officers Lucchetti and Dolan, as well as Matthew Swift's loss of consortium claim, shall proceed to trial.

IT IS SO ORDERED,

ENTER:


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  April 13, 2010